**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ERROL RUDMAN and RUDMAN PARTNERS LP, on behalf of the themselves and all others similarly situated,

Plaintiffs,

-against-

CHC GROUP LTD.; WILLIAM J. AMELIO; JOAN S. HOOPER; REBECCA CAMDEN; WILLIAM E. MACAULAY; JONATHAN LEWIS; KENNETH W. MOORE; J.P. MORGAN SECURITIES LLC; BARCLAYS CAPITAL INC.; UBS SECURITIES LLC; HSBC SECURITIES (USA) INC.; RBC CAPITAL MARKETS, LLC; WELLS FARGO SECURITIES, LLC; BNP PARIBAS SECURITIES CORP.; STANDARD BANK PLC; CORMARK SECURITIES (USA) LTD.; COWEN AND COMPANY, LLC; RAYMOND JAMES & ASSOCIATES, INC.; SIMMONS & COMPANY, INTERNATIONAL; and TUDOR, PICKERING, HOLT & CO. SECURITIES, INC.,

Defendants.

Civil Action No. 15-cv-03773 (LAK) and consolidated case

**JURY TRIAL DEMANDED**

**ECF Case**

# CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS


I. NATURE OF THE ACTION AND FACTUAL OVERVIEW ........ 1

II. JURISDICTION AND VENUE ........ 5

III. PARTIES ........ 5

A. Plaintiffs ........ 5

B. CHC ........ 6

C. The Individual Defendants ........ 7

D. The Underwriter Defendants ........ 8

IV. RELEVANT NON-PARTIES ........ 15

A. CHC's Largest Customer, Petrobras ........ 15

B. CHC's Largest Publicly-Traded Competitors: Bristow and Era ........ 16

V. CLASS ACTION ALLEGATIONS ........ 16

VI. SUBSTANTIVE ALLEGATIONS ........ 19

A. Relevant Background Information Concerning CHC, the EC225 Grounding, and the EC225 Return to Service ........ 19

1. CHC's Primary Business and Customers ........ 19

2. Helicopter Types and CHC's Helicopter Fleet ........ 21

3. CHC's Contracts: Fixed Monthly Standing Charges and Variable Flying Charges ........ 21

4. The EC225 Grounding ........ 24

5. The EC225 Grounding's Effects on Commercial Helicopter Companies ........ 25

6. The Petrobras Nonpayment and the Petrobras Dispute ........ 26

B. CHC's IPO ........ 30

C. The Registration Statement's Omissions of Material Fact and Materially Misleading Statements ........ 34

1. Applicable Disclosure Requirements .......... 34

2. The Registration Statement Omitted to Disclose the Petrobras Nonpayment and the Petrobras Dispute .......... 36

3. The Registration Statement Made Materially Misleading Statements Concerning Petrobras and CHC's Monthly Standing Charges .......... 38

a. Concerning CHC's Largest Customer, Petrobras .......... 38

b. Concerning CHC's Largest and Purportedly Most Secure Revenue Stream, Monthly Standing Charges .......... 42

4. The Registration Statement's Disclosures Concerning the EC225 Grounding Did Not Disclose the Omitted Facts or Correct the Misleading Statements .......... 45

5. The Registration Statement Made Materially Misleading Disclosure Concerning the Operational and Financial Consequences to CHC of the EC225 Grounding .......... 51

6. Materiality .......... 53

D. Post-IPO Disclosures Reveal the Registration Statement's Material Misrepresentations and Omissions .......... 56

1. March 12, 2014 .......... 56

2. July 9-10, 2014: The Petrobras Nonpayment is Finally Revealed .......... 57

E. Contemporary Public Disclosures Made by CHC's Peers, Era and Bristow, Concerning the EC225 Suspension and its Effects .......... 59

1. Era's Disclosures .......... 59

a. Overview .......... 59

b. Details .......... 61

2. Bristow's Disclosures .......... 71

COUNT I .......... 75

COUNT II .......... 76

COUNT III .......... 78

PRAYER FOR RELIEF .......... 79

JURY DEMAND .......... 79

Lead Plaintiffs Errol Rudman and Rudman Partners LP (collectively, "Rudman" or "Lead Plaintiff") and Plaintiff Gagik Ygiazaryan ("Ygiazaryan" and, together with Rudman, "Plaintiffs") individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of: (i) U.S. Securities and Exchange Commission ("SEC") filings by CHC Group Ltd. ("CHC" or the "Company") and by its subsidiary, CHC Helicopter S.A.; (ii) press releases, presentations, conference calls with analysts and investors, and other public statements issued by CHC; (iii) securities analyst reports, media reports and other publicly disclosed reports and information about Defendants; (iv) SEC filings, media reports and other publicly disclosed reports and information concerning commercial helicopter operators, including CHC's largest competitor, Bristow Group Inc. ("Bristow"), and Era Group Inc. ("Era"), and (v) interviews with and information received from former CHC employees and other persons who had contact and interaction with CHC management during the relevant period. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth hereinafter after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION AND FACTUAL OVERVIEW

1. This is an action on behalf of all persons or entities who purchased shares of CHC common stock pursuant and/or traceable to the Registration Statement for CHC's January 16, 2014 initial public offering of common stock (the "IPO"), including (a) CHC shares purchased in the IPO on or about January 16, 2014, as well as (b) CHC shares purchased on the open market during the period from January 16, 2014 through July 10, 2014, inclusive (the "Class Period").

2. The action charges CHC, certain of its officers and directors, and the underwriters of CHC's IPO (collectively and as further specified herein, "Defendants") with violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").

3. As further detailed herein:

a. CHC, at all relevant times, was one of the world's largest commercial helicopter operators, generating more than 80% of its revenues from customers in the oil and gas industry for whom, primarily, CHC provided helicopter transportation to rotate crews on and off offshore oil/gas production and/or exploration facilities;

b. CHC single largest customer, Petróleo Brasileiro S.A. ("Petrobras") alone accounted for more than 14% of CHC's total revenues;

c. CHC's contracts provided CHC with two distinct fee streams, including:

    i. less importantly, variable "flight charges," based on hours of actual helicopter operation, which accounted for 25% of the fees payable to CHC; and

    ii. more importantly, fixed "standing charges," accounting for 75% of the fees payable to CHC, based on reserving specific CHC helicopter capacity for given customers during the 4-5 year life of the contract, and payable monthly, as Defendants explained, "irrespective of whether we fly."

d. Such fixed standing charges, as Defendants further explained to investors:

    i. accounted for approximately 70% of CHC's total revenues; and

    ii. accounted for materially all of CHC's profits.

e. One particular type of helicopter, the Eurocopter EC225 (the "EC225") experienced multiple malfunctions in May and October 2012, after which:

    i. effectively all EC225s worldwide were grounded from October 2012 through various times during the second half of 2013 (the "EC225 grounding");

    ii. EC225 flights resumed at different times in different geographical regions during the second half of 2013, and resumed last of all in Brazil in December 2013 (the "EC225 return to service").

4. On January 16, 2014, Defendants completed CHC's IPO, selling approximately 34 million shares of CHC common stock at a price to the public of $10.00 per share and receiving approximately $340 million in gross proceeds, pursuant to a registration statement on Form S-1 filed with the SEC on September 19, 2013 and subsequent amendments thereto (filed with the SEC, respectively, on October 25, November 22, December 19, 2013, and January 6, 10, 13, 14 and 16, 2014), together with a final prospectus dated January 16, 2014 (the "Prospectus" and, collectively with the registration statement, as amended, and all exhibits thereto and all documents incorporated therein, the "Registration Statement"). Beginning on January 17, 2014 CHC shares have traded on the New York Stock Exchange under the symbol "HELI."

5. The Registration Statement was negligently prepared, contained omissions of material fact and materially misleading statements, and was not prepared in accordance with the rules and regulations governing the preparation of such documents.

6. Specifically and as detailed herein, the Registration Statement omitted to disclose material facts concerning certain of the operational and financial impacts to CHC of the EC225 grounding, namely:

a. the fact that CHC's largest customer, Petrobras:

i. in or about March 2013, had formally notified CHC that it would refuse to pay any and all sums owed to CHC under contracts with CHC for EC225 helicopter services*, including the fixed monthly standing charges specified under such contracts*, until EC225 services resumed (*i.e.*, until the EC225 return to service);

ii. in April 2013, had stopped paying all such sums, including contractually-specified fixed monthly standing charges, and had continued to refuse to pay such sums for the remainder of the EC225 grounding and until the EC225 return to service (the "Petrobras nonpayment");

b. the fact that, CHC, prior to the IPO, had elevated the Petrobras nonpayment into a formal dispute with Petrobras concerning such sums (the "Petrobras dispute"); and

c. facts sufficient to provide CHC investors with adequate understanding of the EC225 grounding's effects on CHC.

7. Furthermore, and as detailed herein, certain statements made in the Registration Statement were rendered materially misleading in light of such omissions, including statements concerning:

a. CHC's largest customer, *i.e*. Petrobras;

b. CHC's largest stream of revenues, *i.e*. the fixed monthly standing charges from contracts with oil/gas customers such as and including Petrobras; and

c. the EC225 grounding and certain of its operational and financial impacts to CHC.

8. Defendants' disclosures in the Registration Statement were *not* the norm in the industry at the time. As also detailed herein, CHC's largest publicly-traded competitors provided timely, transparent, accurate and adequate disclosure at the very same time concerning the very same matters: the EC225 grounding; its operational and financial impacts; and the degree to which their largest customers continued to make timely, full or any payment of monthly standing charges.

9. Defendants' disclosures thus constitute a demonstrably negligent exception to the disclosure practice rule actually operative in the industry at the time.

10. On July 9-10, 2014, CHC belatedly disclosed the Petrobras nonpayment and the material extent of its financial consequences to CHC. CHC's ensuing July 10, 2014 share price decline (from $8.62 to $7.63, a decline of 11.5%) evidences the materiality of this information to investors, as well as the fact that it had previously been unknown to the investing public.

11. Damages under Section 11 of the Securities Act are, presumptively, the difference between: (1) the price at which CHC shares were purchased, albeit in no event exceeding the IPO price ($10.00 per share); and (2) for Class Members who continue to hold CHC shares, the

"value" of CHC stock at the time when Securities Act claims were first filed on behalf of CHC investors (April 17, 2015), and for Class Members who sold CHC shares, the greater of the shares' sale price or the aforementioned share "value" as of April 17, 2015. Usually, such "value" is indicated by the market price of the security in question, which, at close of trading on April 17, 2015, was $1.23 per share.

## II. JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77o).

13. This court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

14. Venue is proper in this District pursuant to Section 22 of the Securities Act, and 28 U.S.C. § 1391 (b), (c) and (d). Defendants conducted business in this District, and many of Defendants' acts and conduct complained of herein, including Defendants' preparation and dissemination of materially false information in connection with the IPO, and the IPO, occurred in substantial part in this District. Many of the Underwriter Defendants maintain their principal places of business in this District, and CHC shares traded on the New York Stock Exchange, based in this District, at all relevant times subsequent to the IPO.

15. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

16. Lead Plaintiff Rudman purchased CHC shares issued pursuant and/or traceable to the Registration Statement, including shares in CHC's IPO which Rudman purchased from Defendant BarCap, and was damaged thereby, as detailed in the sworn certification that Lead

Plaintiff previously filed with the Court (*see* Dkt. 29, Ex. 2), which is incorporated herein by reference.

17. Plaintiff Ygiazaryan purchased CHC shares issued pursuant and/or traceable to the Registration Statement and was damaged thereby, as detailed in the sworn certification that Plaintiff Ygiazaryan previously filed with the Court (*see* Dkt. 26, Ex. A), which is incorporated herein by reference.

**B. CHC**

18. Defendant CHC is a holding company for CHC's various operating businesses, incorporated on July 3, 2008 under Cayman Islands law. CHC maintains registered offices located at 190 Elgin Avenue, George Town, Grand Cayman, KYI-9005, Cayman Islands (c/o Intertrust Corporate Services (Cayman) Ltd.), and principal executive offices located at 4740 Agar Drive, Richmond, BC V7B A13, Canada. CHC also maintains offices in the various countries in which it operates, including in the United States (CHC's Global Operations Center is located in Irving, Texas), Canada, Scotland, Norway, Netherlands, Poland, Australia and Brazil, as well as an office for service of process through CT Corporation System in the State of New York, at 111 Eighth Avenue, New York, NY 10011.

19. CHC sold approximately 34 million shares in the IPO (including 31 million shares originally sold in the IPO as well as approximately 3 million further shares sold, as further detailed below, following the Underwriter Defendants' partial exercise of the over-allotment option) receiving approximately $314 million in net proceeds after paying (a) an underwriting discount and commission of $0.525 per share to the Underwriter Defendants, and (b) IPO-related expenses of $8.5 million. As further detailed herein, CHC thereafter used certain the largest part of these net proceeds, $225 million, to pay down all of CHC's outstanding indebtedness under CHC's senior secured revolving credit facility, including indebtedness under such credit facility to affiliates of four of the Underwriter Defendants (specifically, HSBC, RBS, UBS and Wells

Fargo). Consequently, affiliates of these four Underwriter Defendants each received at least 5% of the total CHC IPO net proceeds. *See* Prospectus at 16, 189.

**C. The Individual Defendants**

20. Defendant William J. Amelio ("Amelio") was, at the time of the IPO and all relevant times prior thereto, CHC's Chief Executive Officer ("CEO"), and a member of CHC's Board of Directors. Defendant Amelio participated in preparing the Registration Statement and conducting the Road Show, and signed the Registration Statement. On or about February 6, 2015, Defendant Amelio was replaced as CHC CEO and director by Karl Fessenden.

21. Defendant Joan Hooper ("Hooper") was at the time of the IPO and all relevant times prior thereto, CHC's Chief Financial Officer ("CFO"). Defendant Hooper participated in preparing the Registration Statement and conducting the Road Show, and signed the Registration Statement. On or about July 15, 2015, Defendant Hooper was replaced as CHC CFO by Lee Eckert.

22. Defendant Rebecca Camden ("Camden") was, at the time of the IPO and all relevant times prior thereto, CHC's Chief Accounting Officer ("CAO"). Defendant Camden participated in preparing the Registration Statement, and signed the Registration Statement. On or about July 17, 2015, Defendant Camden was replaced as CHC CAO by Melanie Kerr.

23. Defendant William E. Macaulay ("Macaulay") was, at the time of the IPO and all relevant times prior thereto, Chairman of CHC's Board of Directors. Defendant Macaulay participated in preparing the Registration Statement, and signed the Registration Statement. On or about October 30, 2014, Defendant Macaualay was replaced as Chairman of CHC's Board of Directors by John Krenicki Jr.. Defendant Macauley, at all relevant times hereto, also served as Chairman and Chief Executive Officer of First Reserve (a private equity firm that had purchased CHC's predecessor and, together with its affiliated funds, was CHC's controlling shareholder – *see* Prospectus at cover, 13, 36-37, 122 and 157-58), where he was responsible for supervision of

all aspects of First Reserve's investment program and strategy, as well as overall management of First Reserve.

24. Defendant Jonathan Lewis ("Lewis) is, and was at the time of the IPO and all relevant times prior thereto, a member of CHC's Board of Directors. Defendant Lewis participated in preparing the Registration Statement, and signed the Registration Statement.

25. Defendant Kenneth W. Moore ("Moore") was, at all relevant times until October 2013, a member of CHC's Board of Directors. Defendant Moore participated in preparing the Registration Statement, and signed the Registration Statement. Defendant Moore, at all relevant times hereto, also served as a Managing Director of First Reserve, where he had overall responsibility for First Reserve's capital markets activities with respect to existing portfolio companies as well as new acquisitions.

26. Defendants Amelio, Hooper, Camden, Macaulay, Lewis and Moore are sometimes referred to collectively herein as the "Individual Defendants."

27. Defendants Amelio, Hooper and Camden are sometimes referred to collectively herein as the "Officer Defendants."

28. Defendants Amelio, Macaulay, Lewis and Moore are sometimes referred to collectively herein as the "Director Defendants."

29. Defendants Macaulay and Moore are sometimes referred to collectively herein as the "First Reserve Defendants."

30. CHC, the Officer Defendants, and the First Reserve Defendants are sometimes referred to collectively herein as the "CHC Defendants."

**D. The Underwriter Defendants**

31. Defendant J.P. Morgan Securities LLC ("JPM"), headquartered at 383 Madison Avenue, New York, New York 10179, acted as one of the IPO's co-lead underwriters (together with Defendant BarCap). Among other things, JPM:

a. purchased 7,740,000 CHC shares from CHC, at a price of $9.475 per share (the $10.00 IPO price less $0.525 per share in underwriting discounts and commissions);

b. undertook to sell, and/or sold, 7,740,000 CHC shares to Class members in the IPO, at a price of $10.00 per share;

c. helped to draft and disseminate the Registration Statement; and

d. acted together with Defendant BarCap as representatives of the Underwriter Defendants.

32. Defendant Barclays Capital Inc. ("BarCap"), headquartered at 745 7th Avenue, New York, New York 10019, acted as one of the IPO's three lead underwriters. Among other things, BarCap:

a. purchased 7,740,000 CHC shares from CHC, at a price of $9.475 per share (the $10.00 IPO price less $0.525 in underwriting discounts and commissions);

b. undertook to sell, and/or sold, 7,740,000 CHC shares to Class members in the IPO, at a price of $10.00 per share;

c. sold CHC shares to Lead Plaintiff in the IPO at a price of $10.00 per share;

d. helped to draft and disseminate the Registration Statement; and

e. acted together with Defendant JPM as representatives of the Underwriter Defendants.

33. Defendant UBS Securities LLC ("UBS"), headquartered at 1285 Avenue of the Americas, New York, NY 10019, and with further offices at 299 Park Avenue, New York, NY 10171, acted as one of the IPO's underwriters. Among other things, UBS:

a. purchased 3,565,000 CHC shares from CHC, at a price of $9.475 per share (the $10.00 IPO price less $0.525 in underwriting discounts and commissions);

b. undertook to sell, and/or sold, 3,565,000 CHC shares to Class members in the IPO, at a price of $10.00 per share; and

c. helped to draft and disseminate the Registration Statement.

34. Defendant HSBC Securities (USA) Inc. ("HSBC"), headquartered at 452 Fifth Avenue, New York, NY 10018, acted as one of the IPO's underwriters. Among other things, HSBC:

a. purchased 3,100,000 CHC shares from CHC, at a price of $9.475 per share (the $10.00 IPO price less $0.525 in underwriting discounts and commissions);

b. undertook to sell, and/or sold, 3,100,000 CHC shares to Class members in the IPO, at a price of $10.00 per share; and

c. helped to draft and disseminate the Registration Statement.

35. Defendant RBC Capital Markets, LLC ("RBC"), headquartered at 60 South Sixth Street, Minneapolis MN 55402, acted as one of the IPO's underwriters. Among other things, RBC:

a. purchased 1,705,000 CHC shares from CHC, at a price of $9.475 per share (the $10.00 IPO price less $0.525 in underwriting discounts and commissions);

b. undertook to sell, and/or sold, 1,705,000 CHC shares to Class members in the IPO, at a price of $10.00 per share; and

c. helped to draft and disseminate the Registration Statement.

36. Defendant Wells Fargo Securities, LLC ("Wells Fargo"), headquartered at 550 South Tryon Street, 6th Floor, Charlotte NC 28202, acted as one of the IPO's underwriters. Among other things, Wells Fargo:

a. purchased 1,705,000 CHC shares from CHC, at a price of $9.475 per share (the $10.00 IPO price less $0.525 in underwriting discounts and commissions);

b. undertook to sell, and/or sold, 1,705,000 CHC shares to Class members in the IPO, at a price of $10.00 per share; and

c. helped to draft and disseminate the Registration Statement.

37. Defendant BNP Paribas Securities Corp. ("BNP"), headquartered at 787 Seventh Avenue, New York, NY 10019, acted as one of the IPO's underwriters. Among other things, BNP:

a. purchased 1,085,000 CHC shares from CHC, at a price of $9.475 per share (the $10.00 IPO price less $0.525 in underwriting discounts and commissions);

b. undertook to sell, and/or sold, 1,085,000 CHC shares to Class members in the IPO, at a price of $10.00 per share; and

c. helped to draft and disseminate the Registration Statement.

38. Defendant Standard Bank Plc ("Standard Bank"), headquartered at 20 Gresham Street, London EC2V 7JE, United Kingdom, acted as one of the IPO's underwriters. Among other things, Standard Bank:

a. purchased 1,085,000 CHC shares from CHC, at a price of $9.475 per share (the $10.00 IPO price less $0.525 in underwriting discounts and commissions);

b. undertook to sell outside the United States, and/or sold, 1,085,000 CHC shares to Class members in the IPO, at a price of $10.00 per share; and

c. helped to draft and disseminate the Registration Statement.

39. Defendant Cormark Securities (USA) Limited ("Cormark"), headquartered at Suite 2800, Royal Bank Plaza South Tower, Toronto A6 M5J 2J2, Canada, acted as one of the IPO's underwriters. Among other things, Cormark:

a. purchased 775,000 CHC shares from CHC, at a price of $9.475 per share (the $10.00 IPO price less $0.525 in underwriting discounts and commissions);

b. undertook to sell, and/or sold, 775,000 CHC shares to Class members in the IPO, at a price of $10.00 per share; and

c. helped to draft and disseminate the Registration Statement.

40. Defendant Cowen and Company, LLC ("Cowen"), headquartered at 599 Lexington Avenue, New York NY 10022, acted as one of the IPO's underwriters. Among other things, Cowen:

a. purchased 775,000 CHC shares from CHC, at a price of $9.475 per share (the $10.00 IPO price less $0.525 in underwriting discounts and commissions);

b. undertook to sell, and/or sold, 775,000 CHC shares to Class members in the IPO, at a price of $10.00 per share; and

c. helped to draft and disseminate the Registration Statement.

41. Defendant Raymond James & Associates, Inc. ("Raymond James"), headquartered at 800 Carillon Parkway, St. Petersburg FL 33716, acted as one of the IPO's underwriters. Among other things, Raymond James:

a. purchased 775,000 CHC shares from CHC, at a price of $9.475 per share (the $10.00 IPO price less $0.525 in underwriting discounts and commissions);

b. undertook to sell, and/or sold, 775,000 CHC shares to Class members in the IPO, at a price of $10.00 per share; and

c. helped to draft and disseminate the Registration Statement.

42. Defendant Simmons & Company International ("Simmons"), headquartered at 700 Louisiana Suite 1900, Houston TX 77002-2753, acted as one of the IPO's underwriters. Among other things, Simmons:

a. purchased 775,000 CHC shares from CHC, at a price of $9.475 per share (the $10.00 IPO price less $0.525 in underwriting discounts and commissions);

b. undertook to sell, and/or sold, 775,000 CHC shares to Class members in the IPO, at a price of $10.00 per share; and

c. helped to draft and disseminate the Registration Statement.

43. Defendant Tudor, Pickering, Holt & Co. Securities, Inc. ("TPH"), headquartered at 1111 Bagby Suite 4900, Houston TX 77002, acted as one of the IPO's underwriters. Among other things, TPH:

a. purchased 775,000 CHC shares from CHC, at a price of $9.475 per share (the $10.00 IPO price less $0.525 in underwriting discounts and commissions);

b. undertook to sell, and/or sold, 775,000 CHC shares to Class members in the IPO, at a price of $10.00 per share; and

c. helped to draft and disseminate the Registration Statement.

44. Defendants JPM, BarCap, UBS, HSBC, RBC, Wells Fargo, BNP, Standard Bank, Cormark, Cowen, Raymond James, Simmons and TPH are referred to collectively herein as the "Underwriter Defendants."

45. Pursuant to an underwriting agreement (the "Underwriting Agreement") between the Underwriter Defendants and CHC, the Underwriter Defendants underwrote the IPO on a firm commitment basis, committing to purchase from CHC the above-detailed amounts of CHC shares – totaling 31,000,000 shares, or 100% of the 31,000,000 CHC shares offered and sold in the IPO.[1]

46. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

a. The Underwriter Defendants are investment banking houses which specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the IPO and shared approximately $17.8 million in fees collectively (including with respect to shares sold following partial exercise of the over-allotment option). The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize CHC shares in the IPO.

b. The Underwriter Defendants arranged a multi-city roadshow in January 2014, prior to the IPO (the "Roadshow"), during which they and CHC executives including Defendants Amelio and Hooper met with potential investors and

---

[1] Pursuant to the Underwriting Agreement, the Underwriter Defendants were granted an option to purchase up to 4,650,000 additional CHC shares for the purpose of covering over-allotments, if any, made in connection with the IPO In February 2014, the Underwriter Defendants exercised such option to offer and sell approximately three million further CHC shares. These additional three million shares offered and sold by the Underwriter Defendants are not reflected in the figures mentioned in the preceding paragraphs. However, pursuant to the Underwriting Agreement, any exercise of the over-allotment option obligated each of the underwriters "to purchase the same percentage of the additional shares" as each underwriter was obligated to purchase from the original 31 million shares. *See* Prospectus at 183.

presented them with information about CHC, its operations, and its finances (the "Roadshow Presentation").[2] By January 14, 2014, the Underwriter Defendants reported having distributed 6,952 copies of CHC's preliminary prospectus, dated January 6, 2014, to various investors.

c. The Underwriter Defendants also demanded and obtained an agreement from CHC that CHC would indemnify the Underwriter Defendants against certain liabilities relating to the IPO, including liabilities under the Securities Act. They also made certain that CHC had purchased millions of dollars in directors' and officers' liability insurance.

d. Representatives of the Underwriter Defendants also assisted CHC and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into CHC's business, operations and finances, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning CHC's operations and finances.

e. In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with CHC's lawyers, management and top executives and engaged in "drafting sessions" between at least September 2013 and January 2014. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii)

[2] *See e.g.* CHC March 12, 2014 conference call transcript, at 2 (in which Defendant Amelio reminisced "[w]hen we spoke with many of during January, during our IPO roadshow, we not only presented; we listened with great interest to what you had to say. . ."); *see also* transcript of Defendant Hooper's presentation on CHC at the May 22, 2014 UBS Global Oil and Gas Conference (in which Defendant Hooper likewise reminisced about "when we were going around on the road show . . .").

the terms of the IPO, including the price at which CHC shares would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of these contacts, the Underwriter Defendants had access to the information underlying the material misrepresentations or omissions alleged herein.

f. The Underwriter Defendants failed to perform adequate due diligence, and were negligent in failing to ensure that the Registration Statement was prepared properly and accurately.

g. The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales of the securities registered thereby, including offers and sales to Plaintiffs and the Class.

47. The Underwriter Defendants' failure to conduct adequate due diligence was a substantial factor leading to the harm complained of herein.

## IV. RELEVANT NON-PARTIES

### A. CHC's Largest Customer, Petrobras

48. Petróleo Brasileiro S.A. ("Petrobras"), a company organized and existing under the laws of Brazil and headquarterd in Rio de Janeiro, Brazil, is one of the world's largest integrated oil and gas companies. Petrobras dominates, and accounts for substantially all of, Brazil's oil and gas exploration, production and refining activity. For example, during 2014, Petrobras' domestic oil production averaged more than 2 million barrels of oil equivalent ("boe") per day, which represented more than 90% of Brazil's total oil production. Petrobras currently operates 134 production platforms, including 77 fixed and 57 floating platforms. Consequently, Petrobras required extensive commercial helicopter services to ferry crews to its offshore exploration and production facilities. *See e.g.* Prospectus at 108. At the time of the IPO, Petrobras was CHC's largest customer. *Id.* at 23.

### B. CHC's Largest Publicly-Traded Competitors: Bristow and Era

49. Bristow Group Inc. ("Bristow") is a company organized under the laws of Delaware, with principal executive offices located in Houston, Texas, and with shares traded on the NYSE under the symbol "BRS." At all relevant times hereto, Bristow was CHC's primary peer and competitor as a provider of helicopter services to the energy industry, with an approximate market share roughly equivalent to CHC's (approximately 33%). At all relevant times:

a. Bristow's fleet included, during 2013, twenty EC225 helicopters; and

b. Bristow's customers included Petrobras (through Bristow's Brazilian affiliate, Líder Aviação ["Lider"]).

50. Era Group Inc. ("Era") is a company organized under the laws of Delaware, with principal executive offices located in Houston, Texas, and with shares publicly traded on the NYSE under the symbol "ERA." At all relevant times hereto, Era, though smaller than CHC and Bristow, operated as one of the world's largest helicopter operators. At all relevant times:

a. Era's fleet included, during 2013, twelve EC225 helicopters; and

b. Era's customers included Petrobras (through Era's Brazilian affiliate, Aeróleo Taxi Aereo S/A ["Aeroleo"]).

51. As detailed herein in Section VI.E, *infra*, Era's and Bristow's public disclosures concerning the effects of the EC225 grounding, including but not limited to the extent to which their largest customers continued or refused to make full, timely, reduced, or any payments on EC225-related contracts, rendered the EC225 grounding and its effects into an open book for their respective investors (rather than the black box it remained for CHC investors).

## V. CLASS ACTION ALLEGATIONS

52. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class") consisting of all those who purchased CHC shares pursuant and/or traceable to the Registration Statement, including (a) those who purchased CHC shares in the IPO itself on or about January 17, 2014, as well as (b)

all those who purchased CHC shares in the open market during the period from January 17, 2014 through and including July 10, 2014 (the "Class Period").

53. As detailed below, the 34 million CHC shares sold in the IPO pursuant to the Registration Statement (including the 31 million shares originally sold and the further 3 million shares sold via the Underwriter Defendants' exercise of their over-allotment option) constituted, throughout the Class Period, the entire universe of CHC shares available for purchase and/or sale in the market. Consequently, all open-market purchasers of CHC shares throughout the Class Period purchased CHC shares that were issued pursuant to, and that are directly and necessarily traceable to, the Registration Statement.

54. Excluded from the Class are Defendants and their families, the officers and directors and affiliates of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

55. The members of the Class are so numerous that joinder of all members is impracticable. 34 million CHC shares were issued and sold in the IPO, and, during the Class Period, average daily CHC share trading volume exceeded 592,000 shares per day. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believes that there are hundreds, if not thousands, of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by CHC or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

56. During the Class Period, *all* CHC shares that traded in the open market subsequent to the IPO – and, thus, all CHC shares purchased by Class members subsequent to the IPO – were directly, and necessarily, traceable to the Registration Statement. The following facts establish that, throughout the Class Period, the *only* CHC shares available on the market were the CHC shares issued, offered and sold in the IPO, pursuant to the Registration Statement:

a. the IPO was the *initial* public offering of CHC shares, and, "[p]rior to this offering, there has been no public market" for CHC shares (Prospectus, at cover page, 186);

b. no other CHC shares were made available to the public, because:

c. no subsequent "secondary" offerings or sales of CHC shares were made during the Class Period;

d. CHC, all of CHC's directors and officers, and *all* of CHC's existing shareholders, entered into "lock-up agreements" pursuant to which they agreed not to "offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any ordinary shares . . ." for a period of "180 days after the date of this prospectus [the Prospectus]" (Prospectus, at 185); and

e. as a result of such lock-up agreements, all remaining CHC shares – *i.e.*, those held by CHC, CHC officers and directors, and CHC's existing shareholders – were barred from any possible introduction into the market during the Class Period, which ended shortly before the above-mentioned 180 day lock-up period expired.

57. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

58. Plaintiffs will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class and securities litigation.

59. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants' acts as alleged herein violated the Securities Act;

b. whether the Registration Statement contained inaccurate statements of material fact, and/or omitted material information required to be stated therein; and

c. to what extent the members of the Class have sustained damages and the proper measure of damages.

60. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI. SUBSTANTIVE ALLEGATIONS

61. Plaintiffs' Securities Act claims alleged herein are not based on any allegations of intentional or reckless misconduct on the part of the Defendants, and do not allege fraud. Plaintiffs specifically disclaim any reference to or reliance upon allegations of fraud in these non-fraud claims under the Securities Act.

### A. Relevant Background Information Concerning CHC, the EC225 Grounding, and the EC225 Return to Service

#### 1. CHC's Primary Business and Customers

62. At all relevant times, CHC was one of the world's two largest commercial helicopter operators. CHC billed itself as the largest such operator, based on revenue ($1.7 billion for fiscal 2013) and the number of heavy and medium helicopters in its fleet (238). *See* Prospectus at 1.[3]

63. CHC flew, in 30 countries across the globe, a fleet of 238 heavy and medium helicopters (*i.e.*, helicopters that could fly substantially farther, and carry substantially more

[3] Bristow also billed itself as the largest such operator, based on total fleet size (unlike CHC's fleet, which consisted solely of medium and heavy helicopters, Bristow's fleet also included approximately 160 light helicopters). *See* Bristow May 23, 2013 Form 10-K, at 3.

persons, than light helicopters), serving, primarily, major oil and gas producers and drillers, for whom helicopter travel was often the only practical way to manage large, long-distance and frequent crew changes on offshore production facilities and drilling rigs. *See* Prospectus at 1-4, 98-102. As laws and labor agreements often require that crews on such facilities be changed every seven to fourteen days, the helicopter needs of such customers were considerable: during the 12 month period ended October 31, 2013, CHC operated approximately 86,000 flights carrying more than 1 million passengers. *Id*. at 4, 103.

64. Flight operations for such oil and gas customers formed the backbone of CHC's Helicopter Services segment: during the six months ended October 31, 2013, such operations accounted for 84% of CHC's total revenues. *See* Prospectus at 1-2, 53, 107, 113. CHC's Helicopter Services segment also included a much smaller set of flight operations, accounting for 9% of CHC's total revenues, in which CHC provided governmental customers with helicopter "search and rescue" services and "emergency medical services" ("SAR" and "EMS"). *Id*. at 1, 52-53, 113. CHC also maintained a separate segment, Heli-One, that provided maintenance, repair and overhaul ("MRO") services to the Helicopter Services segment and third-party customers, and that accounted for the remaining 7% of CHC's total revenues for the six month period ended October 31, 2013. *Id*. at 2, 4, 52-53, 113.

65. Indeed, 60% of CHC's total annual revenues were derived from a mere ten energy companies, including Petróleo Brasileiro S.A. ("Petrobras"), Statoil ASA, BP plc, Chevron Corp., ConocoPhillips Co., Eni S.p.A., Royal Dutch Shell plc and Total S.A.. *See* Prospectus at 8. Petrobras and Statoil – CHC's two largest customers – each accounted for 14% of CHC's total revenues during fiscal 2013. *Id*. at 8, 23. Petrobras was CHC's single largest customer, based on revenues contributed during CHC's most recently-completed fiscal year (ended April 30, 2013). *Id*. at 23.

### 2. Helicopter Types and CHC's Helicopter Fleet

66. Helicopters are generally classified as light (3-7 passengers), medium (8-15 passengers) and heavy (16 to 26 passengers). Prospectus at 5, 104.

67. CHC's fleet, numbering 238 aircraft altogether as October 31, 2013, consisted solely of medium and heavy helicopters. *Id*. Medium and heavy helicopters were favored by CHC's customers, and better suited for crew change transportation services on oil and gas production facilities and drilling rigs, due to their greater flight range, higher passenger capacity, ability to fly under a broader variety of conditions, and enhanced passenger safety systems. *Id*.

68. As of October 31, 2013, CHC's fleet of heavy helicopters included 31 Eurocopter EC225s ("EC225s"), 37 Sikorsky S92As ("S92s"), and 40 Eurocopter AS332Ls ("AS332Ls," a predecessor of the newer EC225). *See* Prospectus at 6. EC225s and S92s had an approximate range of 400 nautical miles and room for 19 passengers, while the older AS332Ls had slightly lesser capacity (17-19 passengers) and substantially shorter range (250-350 nautical miles).

69. At all relevant times, the small number of helicopter manufacturers (with four manufacturers, including Eurocopter and Sikorsky, supplying 95% of the helicopters used for oil/gas crew transportation) and the high demand for medium and heavy helicopters meant that the available supply of such helicopters was extremely limited, and that delivery of helicopters occurred *years* after such helicopters were ordered. *See e.g*. Prospectus at 25, 56, 98-101.

### 3. CHC's Contracts: Fixed Monthly Standing Charges and Variable Flying Charges

70. CHC's contracts with such energy company customers provided for two distinct payment streams: one fixed, one variable. *See* Prospectus at F-11.

71. The fixed component consisted of a fixed monthly fee, often referred to as a "monthly standing charge," payable to CHC in essence for reserving helicopter capacity (*i.e*., a helicopter and/or pilots standing ready to provide flight services when needed), and payable irrespective of any actual flight operations. *Id*.; *see also* Defendant Hooper's more fulsome explanation at ¶ 75 *infra*. Put differently, even if the helicopter made available under such

contract was never used for flight, the fixed monthly standing charge fees continued to accrue in full to CHC. *Id.*, *see also* Roadshow Presentation at 8 ("Key Investment Highlights" slide, noting the "financial visibility" provided by "high fixed monthly revenue component" in CHC's long-term contracts with oil/gas customers), and 19 ("Disciplined Growth: Financial Visibility" slide, noting that over the past three years, 73% of CHC Helicopter Services' revenues stemmed from "fixed monthly charges").

72. The variable component consisted of additional and further fees payable to CHC based on actual flight services provided (*e.g.*, hours flown). Prospectus at F-11.

73. Of these two payment streams, the former – *i.e.*, the monthly standing fees – was by far the larger: fixed monthly charges accounted for 71%-75% of CHC Helicopter Services' revenues between fiscal 2011-2013. Prospectus at 1. *See also* Roadshow Presentation at19 ("Disciplined Growth: Financial Visibility" slide, noting that over the past three years, 73% of CHC Helicopter Services' revenues stemmed from "fixed monthly charges"). As CHC Helicopter Services accounted for approximately 90% of CHC's consolidated revenues, fixed monthly standing charges consequently accounted for more than 65% of CHC's consolidated revenues.

74. As further detailed below, Defendants repeatedly touted this fact, and certain of its purported beneficial consequences, to CHC analysts and investors, including in the Registration Statement and the Roadshow Presentation. Those consequences, according to Defendants, were that CHC's revenue and profit streams were predictable, secure and visible to CHC investors long in advance.

75. For example, in remarks to analysts and investors attending the May 22, 2014 UBS Global Oil and Gas Conference, in Austin, Texas, where Defendant Hooper presented on CHC at 10:35 a.m. Central Daylight Time, Defendant Hooper explained that the size and nature of CHC's fixed monthly standing charges provided CHC with "a tremendous amount of forward revenue and profit visibility":

> About two thirds of our flying revenue for the oil and gas revenues is linked to production – so a very predictable stream, a very resilient revenue stream. . . The structure of the contracts, for production contracts, are typically 4 to 5 years in length. *We have about 75% of the revenue tied up in what we call a monthly standing charge. So that's a fixed revenue stream irrespective of whether we fly – and most of the economics are tied up into that monthly stream*. So if you take the length of the contracts, 4-5 years, the structure of the contracts, both the MSC [monthly standing charge, at] 75%, and two-thirds production. . . that's a pretty predictable revenue and profit stream. *So as we enter the year, we have about 70% of our flying revenue already secure*.[4] [italics added for emphasis]

76. CHC's monthly standing charges, paid "irrespective of whether we fly," purportedly:

a. eliminated various risks otherwise inherent in the oil/gas business, including exploration risks (*e.g*., fields that turned out to be poor or dry), production risks (*e.g*., poor weather functioning to prevent operations, or other disruptions such as the EC225 grounding discussed herein), and, most particularly, the risk of not flying;

b. consequently, provided a particularly *stable* and "*secure*" revenue stream; and

c. were the source of operating profits, which were built into such charges, and which would be generated in full without having to do any actual flying or receive any variable flight charges (*i.e*., as indicated by Defendant Hooper's above-quoted but more terse explanation that "most of the economics are tied up into that monthly stream"). (Variable flight charges were set to merely cover the incremental costs of flying.)

77. CHC's competitors, Bristow and Era, employed substantively identical contracts bifurcated into a smaller stream of variable flight charges, based on hours flown, and a larger

---

4 The presentation delivered at the conference was attached as an exhibit to a May 22, 2014 Form 8-K filed by CHC with the SEC; *see also* May 13, 2014 CHC press release titled "CHC Helicopter CFO To Present at UBS Global Oil and Gas Conference on May 22."

stream of monthly standing charges, based on reserving dedicated helicopter capacity for given clients.

#### 4. The EC225 Grounding

78. A series of incidents and malfunctions affecting EC225s, including EC225 "ditchings" in May 2012 and again on October 22, 2012, led thereafter to an industry-wide suspension of almost all EC225 flights pending investigations by regulatory entities and the EC225's manufacturer into the causes of the EC225's problems (the "EC225 grounding").

79. The EC 225 grounding affected approximately 89 EC225s, including many or even all of the EC225s operated by CHC. During the EC225 grounding, the only EC225s that continued to fly were (1) aircraft engaged in search and rescue operations, and (2) eight EC225s in China and Vietnam, where local regulators permitted EC225s to continue flying.

80. The EC225 grounding lasted until the below-discussed EC225 return to service, which, allowed EC225s – bearing below-discussed interim fixes to allow for safe operation – to resume flight operations at different times in different geographical regions between July 2013 and December 2013.

81. In May-June 2013, the EC225's manufacturer and regulators traced the cause of the EC225's problems to a component in the EC225 gearbox known as the bevel gear vertical shaft, which in certain circumstances developed cracks that in turn led to helicopter loss of function and failure.

82. Industry participants and regulators thereafter developed and approved, by July 2013, a two-pronged solution to this problem.

a. In the longer term, and as an ultimate solution, all EC225s would be retrofitted with a new and improved replacement for the old bevel gear vertical shaft, thereby resolving the root cause of the problems that had led to the EC225 grounding. Retrofitting all 250 EC225s with new components, however, would not be completed until 2015.

b. Consequently and in the interim, a series of temporary solutions was devised and agreed upon, including new operating protocols and new inspection and maintenance regimes, in order to allow EC225 flights to resume more quickly.

83. With such interim solutions in place, EC225 flights resumed in different geographical areas and jurisdictions at different times between late July 2013 and mid-December 2013 (the "EC225 return to service").

84. The EC225 return to service began first in Angola, with flights operated by SonAir, the aviation division of Angola's national oil company Sonangol, resuming on July 29, 2013. By September 19, 2013, EC225s had been cleared to fly in Europe, the United States and Australia, and 44 of the 89 grounded EC225s had by then returned to service.

85. The EC225 return to service arrived in Brazil last, where the EC225 return to service was completed in mid-December 2013.

### 5. The EC225 Grounding's Effects on Commercial Helicopter Companies

86. The EC225 grounding rendered a large part of worldwide fleet of heavy helicopters serving oil/gas customers inoperational, between October 22, 2012 and various times during the second half of 2013 with the phased-in EC225 return to service. However, such oil/gas customers' transportation needs remained constant.

87. In light of the EC225 grounding, the principal operational issues facing commercial helicopter companies such as CHC, and its competitors Bristow and Era, included:

a. the extent of the loss of EC225 functionality, driven by:

i. *How many* of their EC225s were affected by the EC225 grounding;

ii. *Where* their grounded EC225s were located (as the EC225 return to service varied substantially by geographical region); and

iii. *For whom* their EC225s were flying (as reactions to the EC225 grounding varied substantially by customer);

b. the extent of the actions taken (or not) to replace the lost transportation capacity of the EC225s and provide customers with the transportation services they had contracted for but could no longer receive via EC225s; and

c. in the event such actions could not be or were not taken, the extent to which customers defected to competing helicopter services who could provide such services.

88. Each of the above operational matters generated financial impacts to commercial helicopter companies such as CHC, and its competitors Bristow and Era (whose contracts and dependence on fixed monthly standing charges were similar to CHC's), including:

a. the extent of lost revenues, if any, resulting from the EC225 grounding and the fact that EC225s were no longer flying – which largely boiled down to the degree to which customers continued to pay the fixed monthly standing charges specified by applicable EC225 contracts;

b. the cost of providing alternative transportation services, if any, to supply customers with the transportation services they had contracted for but were not receiving from EC225s – and revenues earned from such services (which largely replaced variable flight charges lost as a result of the EC225 grounding); and

c. the extent of lost revenues, if any, resulting from customer defections to competitors.

**6. The Petrobras Nonpayment and the Petrobras Dispute**

89. During the EC225 grounding, at least 12 EC225s were contracted to Petrobras by various commercial helicopter operators, as contemporary disclosures by Bristow and Era, detailed herein, reveal. As further detailed herein, although Defendants omitted to disclose the number of CHC EC225s under contract to Petrobras – or indeed that any CHC EC225s had been contracted to Petrobras – disclosures made by CHC's peers, including Era and Bristow, indicate that eight of the EC225s (not) flying for Petrobras were CHC's. Specifically, such disclosures

indicate that three of the twelve Petrobras EC225s were provided by Era and zero by Bristow, while the nine further Petrobras EC225s were provided by two further unidentified operators (one of whom, OMNI Helicopter International, operated only one EC225). Consequently, CHC accounted for the remaining eight of these nine further Petrobras EC225s.

90. In March 2013, Petrobras formally notified all of its EC225 providers, including CHC, that, in light of EC225 grounding and under Petrobras' interpretation of the EC225 contracts, Petrobras would cease making any and all payments under its EC225 contracts, including any payment of the monthly standing charges specified under such contracts, beginning in April 2013 and lasting for the duration of the EC225 grounding. CHC's peer Era so disclosed in and after May 2013 (*see* Section VI.E.1, *infra*). This allegation is further supported by: (1) CHC's belated admissions on July 10, 2014 (*see* Section VI.D.2, *infra*) that Petrobras had applied the Petrobras nonpayment against CHC and all other EC225 providers beginning in April 2013 and lasting through the EC225 return to service; and (2) the accounts of former CHC employees serving here as confidential witnesses, including a former CHC executive based in Brazil at all relevant times hereto ("CW1"). CW1 further stated that Petrobras had advised CHC of the payment suspension formally in March 2013.

91. In April 2013, Petrobras ceased making any and all payments under its EC225 contracts, including any payment of the monthly standing charges specified under such contracts, as Era disclosed in timely fashion in and after May 2013 (*see* Section VI.E.1, *infra*), and as the CHC Defendants belatedly admitted 15 months later, on July 10, 2014 (*see* Section VI.D.2, *infra*). Such nonpayment lasted until the EC225 return to service, *id.*, completed at different times in different geographical regions and last of all in Brazil, in December 2013.

92. Subsequently and prior to CHC's IPO, CHC and other EC225 operators affected by the Petrobras nonpayment elevated the Petrobras nonpayment into a formal dispute with Petrobras.[5] The dispute between Petrobras and CHC was the subject of numerous meetings

[5] As Era disclosed in timely fashion no later than August 13, 2013 (*see* Section VI.E.1, *infra*), as the CHC Defendants belatedly admitted 15 months later, on July 10, 2014 (*see* Section

between Petrobras and CHC personnel, spanning several months. CW1 has personal knowledge of discussions between CHC personnel and representatives of the other EC225 helicopter service providers that were also faced with Petrobras' refusal to make any payments on EC225 contracts during the suspension in mid-to-late 2013.

93. This complaint, in addition to alleging that the Registration Statement:

a. omitted material facts concerning the Petrobras nonpayment and the Petrobras dispute, and

b. contained materially misleading statements concerning CHC's largest customer (Petrobras) and largest payment stream (fixed monthly standing charges), further alleges

c. that the Registration Statement omitted further material facts, concerning the effects of the EC225 grounding on CHC, that were necessary to provide CHC investors with adequate disclosure concerning such effects.

94. In each case, Defendants' disclosure practices were not shared by CHC's largest publicly-traded peers, Bristow and Era. To the contrary, Bristow's and Era's contemporary disclosures *concerning the very same matters* provided their investors with accurate and detailed information concerning:

a. the reactions of, and their disputes with, their largest customers (*e.g.*, Era disclosed that that Petrobras refused to pay certain sums, and that Era was disputing such nonpayment);

b. the degree to which monthly standing charges continued to be paid in full (*e.g.*, Era disclosed that Petrobras refused to pay any and all monthly standing charges

---

VI.D.2, *infra* – noting that CHC had had extended "discussions" with Petrobras concerning the Petrobras nonpayment), and as described by CW1. Additionally, a former CHC Vice President, employed by CHC when and after Petrobras first notified CHC of its refusal to pay monthly standing charges ("CW2"), was told by members of CHC's executive leadership team that in the spring and summer of 2014 the Petrobras nonpayment was a frequent topic of discussion at meetings of the executive leadership team – a team headed by Defendant Amelio.

on contracts for 3 EC225s from April 2013 through the EC225 return to service, with material effect to Era; while Bristow disclosed that, after discussions with certain customers following lack of timely payment of monthly standing charges, Bristow had agreed to allow certain customers to pay slightly reduced monthly standing charged, with immaterial effect to Bristow); and

c. the operational and financial effects of the EC225 grounding on Bristow and Era, including

    i. *how many* of the companies' respective EC225s were affected by the EC225 grounding;

    ii. *where* each of companies' respective grounded EC225s were located;

    iii. *when* such EC225s had returned to service;

    iv. *what* their respective customers' reactions to the EC225 grounding were, (per ¶ 94(b) immediately above);

    v. the companies' operational responses to and solutions for the EC225 grounding, including acquiring new helicopters, mobilizing currently-unused or under-utilized aircraft from elsewhere in their fleet, and refurbishing recently-retired helicopters to bring them back into operation;

    vi. the financial impacts from all the above, including:

        1. a material negative impact from the Petrobras nonpayment; and

        2. a largely inconsequential "wash" from all other matters, as

            a. by and large, with the exception of Petrobras, there had been no disagreements or disputes with customers;

            b. by and large, customers other than Petrobras had continued to pay full monthly standing charges;

            c. the absence of variable flight revenue on EC225 contracts during the EC225 grounding was counterbalanced by new

revenues from new ad-hoc contracts to provide alternative transportation services during the EC225 grounding;

d. in instances where certain Bristow customers had secured lower monthly standing charge payments, they had been granted only where Bristow had itself managed to reduce its costs (which cost reductions were then passed on the customer); and

e. higher costs generated in the course of providing alternative aircraft to replace EC225s were offset by lower maintenance costs on EC225s during the EC225 grounding.

**B. CHC's IPO**

95. On or about September 19, 2013, Defendants caused CHC to file an initial registration statement on Form S-1 for an initial public offering of CHC stock. The initial registration statement was signed by Defendants Amelio, Hooper, Camden, Macaulay, Lewis and Moore.

96. In subsequent months, the initial registration statement was subsequently amended, in part as a result of the SEC's iterative reviews and comments concerning the disclosures made therein by Defendants, and the SEC's requests for additions to and/or alterations of such disclosures, expressed by the SEC to Defendants in letters from the SEC ("Comment Letters") dated (1) October 16, 2013, (2) November 7, 2013, (3) December 6, 2013, (4) December 24, 2013, and (5) January 8, 2014. CHC replied to these Comment Letters with reply letters to the SEC – respectively dated (1) October 25, 2013, (2) November 22, 2013, (3) December 19, 2013, (4) January 6, 2014, and (5) January 10, 2014 – attaching iteratively amended registration statements on Form S-1/A (specifically, amendments one through five). Defendants filed additional amendments (six through eight) on Form S-1/A on, respectively, January 13, 14 and 16, 2014. Each of the initial and amended registration statements also

included a similarly-dated preliminary prospectus for the IPO. The January 6, 2014 preliminary prospectus, included in amendment four to CHC's registration statement, was employed by Defendants, prior to the issuance of the Prospectus, as the operative "red herring" prospectus.

97. Each of these amended registration statements was signed by Defendants Amelio, Hooper, Camden, Macaulay and Lewis. Defendant Moore signed only the initial September 19, 2013 registration statement, before relinquishing his position on CHC's Board of Directors in October 2013.

98. Certain of the SEC Comment Letters repeatedly criticized the nature, extent and adequacy of Defendants' disclosures concerning the EC225 grounding and its effects on CHC's results of operations, and requested more particular and quantified disclosures concerning these matters, including quantification of "the decrease in revenue as a result of the EC225 grounding." *See e.g*. October 16, 2013 SEC Comment Letter, at 4 (comment 23);[6] November 7, 2013 SEC Comment Letter, at 2 (comment 5, following up on comment 23 in the October 16, 2013 Comment Letter.[7] Although Defendants' subsequent responses to the above-detailed SEC Comment Letter comments included marginally better and more granular disclosures to the

[6] Stating: "23. Throughout your analysis here and for other comparable periods on a consolidated or segment basis, as appropriate, please expand your disclosure to quantify and analyze each identified factor contributing to a change in your various revenue and expense categories so that investors may understand the magnitude and relative impact of each. For example, you disclose on page 57 (i) that Helicopter Services revenue was flat due primarily to the continued grounding of the EC225 offset by increases in revenue from new flying contracts and changes to existing contracts in the North Sea, Asia Pacific and the Africa-Euro Asia regions, and (ii) the additional revenues from new contracts in Norway, Ireland, England, Scotland, Australia, South East Asia, Nicaragua, Mozambique and Benin were partially offset by expired contracts in Denmark, the Netherlands, and the Falklands combined with a decrease in adhoc flying hours in the North Sea compared to the prior year quarter, without quantifying any of these factors."

[7] Stating: "5. We note your response to our prior comment 23. Please quantify each contributing factor to a change in the various revenue and expense categories. For example, you did not quantify the decrease in revenue as a result of the EC225 grounding, the decrease in maintenance cost from the preferential commercial and financial terms offered because of the EC225 stand down, or the increase cost incurred preparing the EC225 for return to service and the additional investment in maintenance of parts inventory to improve helicopter availability."

Registration Statement, Defendants, nevertheless, still and negligently failed to disclose the material facts whose omission is complained of here.

99. On January 14, 2014, in conjoined letters to the SEC from CHC and the Underwriter Defendants, Defendants requested that the SEC declare CHC's registration statement effective on January 16, 2014, at 4:05 p.m., Eastern Time. In its January 14, 2014 request, CHC acknowledged *inter alia* that:

> the action of the Commission or the Staff, acting pursuant to delegated authority, in declaring the filing effective, does not relieve the Company from its full responsibility for the adequacy and accuracy of the disclosure in the filing; and
>
> the Registrant may not assert Staff comments and the declaration of effectiveness as a defense in any proceeding initiated by the Commission or any person under the federal securities laws of the United States.

100. On January 16, 2014, at approximately 4:00 p.m. Eastern Time, the SEC issued a notice of effectiveness declaring CHC's registration statement effective.

101. On January 16, 2014, Defendants filed a Free Writing Prospectus with the SEC, updating prior figures in prior, preliminary prospectuses concerning the number and price of CHC shares to be issued, offered and sold in the IPO, and providing final figures (31 million shares at $10 per share, with an over-allotment option of up to 4.65 million additional shares).

102. Defendants issued a final prospectus for the IPO dated January 16, 2014 (the "Prospectus", and filed it with the SEC, on Form 424B4, on January 21, 2014.

103. The above-detailed registration statement and its amendments thereto, of which the Prospectus was a part (as Defendants repeatedly stated in the Prospectus),[8] are referred to as the Registration Statement.

---

[8] *See e.g.* Prospectus at 12 (". . . this prospectus or the registration statement of which it forms a part"), 15 (same), 143 (". . . the registration statement of which this prospectus forms a part."), 148 (same), 153 (same), 191 ("This prospectus, filed as part of the registration statement . . .").

104. Defendants completed the CHC IPO shortly after the SEC declared the Registration Statement effective, and before the markets opened for trading on January 17, 2014.

105. In and through the IPO and the Registration Statement, Defendants registered, issued and sold – to the Class – 31 million CHC shares at a price of $10.00 per share, as well as a further approximately 3 million shares registered, issued and sold through the Underwriter Defendants' exercise of the over-allotment option.

106. Defendants' gross proceeds from the IPO were approximately $340 million.

107. Net proceeds to CHC were approximately $313.5 million (representing proceeds from the sale of 34 million CHC shares to the Underwriter Defendants at $9.475 per share, minus additional offering expenses to CHC – including legal, accounting and printings costs and various other fees associated with registering and listing CHC shares – of $8.5 million). *See* Prospectus at 184; *see also* CHC's March 12, 2014 investor presentation for CHC's Fiscal 2014 third quarter (the "CHC Q3 2014 Presentation"), at 14.[9]

108. Net proceeds to the Underwriter Defendants, for their part in the CHC IPO, were approximately $18 million (representing the $0.525 per share "underwriting discount" on the 34 million CHC shares that the Underwriter Defendants purchased from CHC at $9.475 per share and sold to Class members at $10 per share). *See* Prospectus at cover page, 184.

109. However, a substantial portion of CHC's above-stated net proceeds from the IPO – specifically, $225 million – was employed by CHC, as stated in the Prospectus and effected one week after the IPO, on January 24, 2014, to pay down all of CHC's outstanding indebtedness (totaling $225 million) under CHC's senior secured revolving credit facility, including indebtedness under such credit facility to affiliates of four of the Underwriter Defendants (specifically, HSBC, RBS, UBS and Wells Fargo). *See* Prospectus at 16, 45 and 189; *see also* CHC Q3 2014 Presentation, at 14. Consequently, affiliates of these four Underwriter Defendants each received, in addition to the above-stated net proceeds accruing to the Underwriter

[9] Available at: http://ir.chc.ca/presentations.aspx?iid=4293047 (at link titled "Fiscal 2014 Third-Quarter Earnings Call Presentation Slides").

Defendants, at least 5% of CHC's total net proceeds from the IPO (the exact amount of CHC's indebtedness to these four entities has not been disclosed). *Id.* Concretely, affiliates of these four Underwriter Defendants each received at least a further $15 million of IPO proceeds.

### C. The Registration Statement's Omissions of Material Fact and Materially Misleading Statements

110. As detailed below, Defendants omitted material facts from the Registration Statement that: (a) they were required to make pursuant to regulations governing the preparation of such documents (set forth in Section VI.C.1, *infra*), and/or (b) that were necessary to render other statements made by Defendants in the Registration Statement not misleading.

#### 1. Applicable Disclosure Requirements

111. The form and content of registration statements are governed by numerous regulations promulgated pursuant to the Securities Act. Among other things, these regulations, as well as the SEC's instructions for registration statements on various SEC forms, set forth specific disclosure requirements with respect to such documents. *See e.g.*

a. Regulation S-K, 17 C.F.R. §§ 229.10 *et seq*. (disclosure requirements for non-financial statement portions of registration statements and other filings);

b. Regulation S-X, 17 C.F.R. §§ 210.1-01 *et seq*. (requirements concerning the form and content of financial statements included with registration statements and other filings);

c. Regulation C, 17 C.F.R. §§ 230.401 *et seq*. (general requirements concerning registration process and disclosure format and presentation for registration statements); and

d. SEC instructions for completing Form S-1 (referencing *inter alia* the above-mentioned Regulations S-K, S-X and C).

112. For example, pursuant to Regulation S-K, a registrant must disclose in a registration statement, as part of the requisite description of the registrant's business, its "dependence. . . upon a single customer, or a few customers" where sales to any such customer

amount to "10% of more of the registrant's consolidated revenues," as the loss of such customers could "have a material adverse effect on the registrant. . ." *See* 17 C.F.R. § 229.101(c)(1)(vii).

113. Likewise, pursuant to Regulation S-K, a registrant must include a "Risk Factors" section that provides "a discussion of the most significant factors that make the offering speculative or risky," focusing on risks *particular* to the registrant ("Do not present risks that could apply to any issuer or any offering."). *See* 17 C.F.R. § 229.503(c).

114. Further, pursuant to Regulation S-K, a registrant must:

a. "[d]escribe any unusual or infrequent events . . . that materially affected the amount of reported income from continuing operations" and, "[i]n addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations."; and

b. "[d]escribe any known trends or uncertainties that have had or that the registrant expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," including mandatory disclosure of "events that will cause a material change in the relationship between costs and revenues. . ."

*See*, respectively, 17 C.F.R. § 229.303(a)(3)(i) and (ii); *see also* 17 C.F.R. § 229.303(b).

115. Furthermore, Item 11A of Form S-1 requires registrants to "describe any and all material changes in the registrant's affairs" which (a) occurred since the end of the last fiscal for which audited financial statements were publicly disclosed, and (b) have not been described in other of the registrant's SEC filings on Forms 10-Q or 8-K. Registrants typically provide disclosures pursuant to this instruction under the captions of "Recent Developments" or "Subsequent Events."

116. Lastly, pursuant to Regulation C, in addition to certain information expressly required by regulation (including those identified immediately above, as well as many others), a registration statement must also include such "further material information . . . as may be

necessary to make the required statements, in the light of the circumstances under which they were made, not misleading."

> In addition to the information expressly required to be included in a registration statement, there be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading.

*See* 17 C.F.R. § 230.408.

**2. The Registration Statement Omitted to Disclose the Petrobras Nonpayment and the Petrobras Dispute**

117. Defendants negligently failed to disclose in the Registration Statement the Petrobras nonpayment and the Petrobras dispute.

118. Specifically, Defendants negligently omitted to disclose in the Registration Statement:

a. that in early 2013, CHC's largest customer, Petrobras had notified CHC that it disputed the amounts owed to CHC as fixed monthly standing charges under applicable EC225-related contracts, and had informed CHC of its intent to pay sums constituting a significant reduction from the amounts contractually-specified;

b. that in March 2013, CHC's largest customer, Petrobras, had notified CHC of its intent to cease all payments owed to CHC under applicable EC225-related contracts, beginning in April 2013 and lasting for the duration of the EC225 grounding, including not only variable flight charges (which per contract were $0, as no EC225s were actually flying), but also fixed monthly standing charges which, per contract and unlike variable flight charges, remained payable in full irrespective of actual EC225 flight status, and which accounted for 70%-75% of the payment stream generated by such contracts to CHC;

c. that in April 2013, and all times thereafter until EC225 return to service, which in Petrobras' case was December 2013, CHC's largest customer, Petrobras, had in fact refused to make any and all payments owed to CHC under applicable EC225-related contracts;

d. that, consequently, at all times from early 2013 to the IPO, CHC was involved in a material dispute with its largest customer, Petrobras, arising from the EC225 grounding and the subsequent Petrobras nonpayment; and

e. that, prior to the IPO, the dispute between CHC and Petrobras had been elevated and concretized into a formal dispute between the two companies.

119. The above information was required to be disclosed in the Registration Statement pursuant to the above-identified regulations governing the content of registration statements (set forth in Section VI.C.1, *supra*) including those pertaining to:

a. disclosures concerning very large customers, such as Petrobras was for CHC, per 17 C.F.R. § 229.101(c)(1)(vii);

b. disclosures concerning particularized risk factors to CHC and CHC investors, such as those constituted by the Petrobras nonpayment and the Petrobras dispute, per 17 C.F.R. § 229.503(c);

c. disclosures concerning "Recent Developments," such as the Petrobras nonpayment and Petrobras dispute were for CHC, per Item 11A of Form S-1;

d. disclosures concerning "unusual or infrequent events . . . that materially affected the amount of reported income from continuing operations," any "known trends or uncertainties that have had or that the registrant expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," and/or "events that will cause a material change in the relationship between costs and revenues," such as the Petrobras nonpayment and Petrobras dispute were for CHC, per 17 C.F.R. §§ 229.303(a)(3)(i)-(ii) and (b).

e. all of the above, per 17 C.F.R. § 230.408.

120. Indeed, and pursuant to these regulations, CHC's publicly traded competitors Bristow and Era, disclosed exactly such information – *i.e.*, that certain customers, including certain of the companies' *largest* customers, were refusing to make timely, full or *any* payment of monthly standing charges on EC225-related contracts – in the applicable sections of their contemporary SEC filings, including sections discussing and disclosing:

a. their largest customers and their reliance on such customers;

b. risk factors;

c. recent developments; and

d. unusual or infrequent events, and/or known trends or uncertainties, that could or did materially impact revenues or sales (a requisite part of the requisite "Management Discussion and Analysis" section of SEC filings).

*See* Section VI.E, *infra*.

121. Additionally, the above information was required to be disclosed in the Registration Statement because its omission rendered other of Defendants' representations in the Registration Statement materially misleading, as alleged immediately below.

### 3. The Registration Statement Made Materially Misleading Statements Concerning Petrobras and CHC's Monthly Standing Charges

122. Defendants' omission of the above-specified information rendered certain of Defendants' affirmative representations in the Registration Statement, and in the Roadshow Presentation, materially incomplete and materially misleading, including representations concerning:

a. CHC's largest customer, *i.e.* Petrobras;

b. CHC's largest revenue stream, *i.e.* monthly standing charges.

#### a. Concerning CHC's Largest Customer, Petrobras

123. The Registration Statement contained multiple representations concerning Petrobras. Certain of these disclosures were requisite registration statement disclosures pursuant

to, respectively and *inter alia*, 17 C.F.R. § 229.101(c)(1)(vii) and 17 C.F.R. § 229.503(c). *See* Section VI.C.1, *supra*.

124. First, in the course of its requisite description of CHC's business, the Registration Statement identified Petrobras as one of CHC's ten *largest* customers, *see* Prospectus at 8 and 110 (noting that CHC's top two customers were Petrobras and Statoil, each of whom provided CHC with 14% of CHC's total revenues, while no other customers accounted for more than 10% of total CHC revenues). Indeed, the Prospectus in fact identified Petrobras as CHC's single largest customer, *see id*. at 23 (detailing that fiscal 2013 revenues from Petrobras, totaling $247.1 million, were slightly greater than those received from Statoil, $245.9 million).

125. Second, the Registration Statement, furthermore, identified Petrobras as one of CHC's *best* customers, touting as one of CHC's "Competitive Strengths" CHC's "[s]trong long-term relationships" with Petrobras and a handful of other large CHC customers. *See* Prospectus at 9 and 111. Indeed, and as Defendants explained in the Registration Statement, the quality of CHC's relationship with Petrobras was important not merely in the present (given that Petrobras accounted for 14% of CHC's business), but purportedly benefitted and boosted CHC's *future* prospects for winning further, continuing and/or new business from Petrobras:

> **Competitive Strengths**
>
> * * *
>
> • *Strong long-term relationships with leading oil and gas producers*. We believe we have strong relationships with our top ten customers, which include Statoil, Petrobras, BP, Shell, Total, ENI and other oil and gas producers, many of which we have continuously served for over a decade. We establish relationships with our customers at both the regional and global level, which positions us to grow our business as our customers grow. We believe this enables us to better understand our customers' growth objectives and positions us to participate in contract tenders. Our strong customer relationships and track record of performance have allowed us to achieve a 92% retention rate on contract renewals and extensions and a 65% win rate on all contract tenders over the 12 month period through October 31, 2013.

*See* Prospectus at 9 and 111 (bold and italics in original, underline added for emphasis).

126. The foregoing representations concerning the beneficial consequences of CHC's relationship with Petrobras were all the more material in light of Defendants' additional representations in the Prospectus identifying Brazil (where oil/gas operations were dominated by Petrobras) as "one of the fastest growing markets for offshore helicopter transportation services." *See* Prospectus at 108.

127. Third, as part of its requisite "Risk Factor" disclosures, the Prospectus warned that CHC relied for a large part of its revenues on contracts with Petrobras, and that CHC revenues could decline, with "material adverse effect" on CHC, should Petrobras terminate or not renew such contracts:

> ***We rely on a limited number of large offshore helicopter support contracts with a limited number of customers. If any of these are terminated early or not renewed, our revenues could decline.***
>
> We rely on a limited number of large offshore helicopter support contracts with a limited number of customers. For the fiscal year ended April 30, 2013, revenue from Statoil ASA totaling $245.9 million and Petrobras totaling $247.1 million were each approximately 14% of our total revenues. For the fiscal year ended April 30, 2013, our top ten customers accounted for approximately 60% of our total revenues. Many of our contracts contain clauses that allow for early termination by the customer for convenience if exercised, could have a material adverse effect on our business, financial condition or results of operations.

*See* Prospectus at 23 (bold and italics in original).

128. The above-specified statements in the Registration Statement concerning Petrobras were materially misleading, because they omitted to also disclose the the Petrobras nonpayment and the Petrobras dispute. Specifically:

a. Prospectus representations identifying Petrobras as one of CHC *largest* customers, and as CHC's largest customer, were materially misleading for failure to also disclose that *CHC's largest customer had refused to pay CHC* any sums owed

under EC225-related contracts, including the large monthly standing charges, during most of the eight months preceding the IPO;

b. Prospectus representations touting Petrobras as one of CHC's *best* customers, and the future benefits to CHC that could flow from its "strong relationship" with Petrobras, were materially misleading for failure to disclose that Petrobras and CHC were also in the midst of a formal dispute; and

c. Prospectus representations acknowledging in general, abstract and/or hypothetical fashion the risk of a material adverse effect to CHC in the event that cash flows from Petrobras contracts ceased were materially misleading for failure to disclose that such risk was neither abstract nor hypothetical, but *concrete and in fact then occurring*, as a result of the Petrobras nonpayment and Petrobras dispute.

129. Indeed, Defendants' above-identified Registration Statement "risk factor" disclosure identifying as a material risk CHC's reliance on payments from contracts with Petrobras, can be directly and instructively compared to similar disclosures in CHC's competitors' SEC filings concerning exactly the same matter. *See* Section VI.E, *infra*, and specifically ¶ 179.

a. Defendants' disclosure in the Registration Statement was stated as an abstract and general principle – namely, in the hypothetical event that Petrobras or other large customers were to cease making contractual payments, CHC revenues could decline with material adverse effect on CHC – and without any indication that such general risk *had actually materialized*.

b. CHC's competitors' disclosures proffered not only the very same general principle, *but also added the relevant and specific fact that this general risk had actually materialized, and that Petrobras had in fact stopped paying on certain contracts relating to EC225s*. *See* ¶ 179, *infra*.[10]

[10] *See e.g.* Era February 28, 2013 Form 10-K, at 13 ("We derive a significant portion of our revenues from a limited number of oil and gas exploration, development and production

**b. Concerning CHC's Largest and Purportedly Most Secure Revenue Stream, Monthly Standing Charges**

130. The Registration Statement, as well as the Roadshow Presentation, contained multiple representations concerning the nature of CHC's contracts with its oil/gas customers and, particularly, the size, importance and benefits to CHC and CHC investors of the fixed monthly standing charges payable to CHC under such contracts.

131. First, the Prospectus explained that CHC's contracts with its oil/gas customers were structured to include fixed monthly standing charges and variable hourly flight charges. *See e.g*. Prospectus at 8 ("Our current oil and gas customer base is comprised of major, national and independent oil and gas companies. These customers generally enter into multi-year contracts for our services. *The majority of our customer contracts provide for revenues based on fixed-monthly charges and hourly flight rates*. In addition, our contracts generally require the customer to either provide or to be charged for fuel, which significantly limits our operational exposure to volatility in fuel costs. Our contracts with offshore oil and gas customers are typically for periods of four to five years, and normally carry extension options of one to five years. . .") (italics added for emphasis); 109 (same); F-11 ("The majority of customer contracts earn revenues based on hourly flight rates, fixed monthly charges or a combination of both. Revenue related to flying services that are billed hourly is recognized as hours are flown. Fixed monthly charges are recognized monthly over the term of the contract.")

132. Second, the Prospectus repeatedly stated that the fixed monthly standing charges were by far the larger, and, in fact, the single largest component of CHC's consolidated revenues.

---

companies. . . Aeróleo, which is highly dependent on Petrobras Brazil, a company which is considering renegotiation or termination of contracts for certain helicopters leased by us to Aeróleo, accounted for . . . 6% of our revenues . . ."). *See also* Era March 21, 2014 Form 10-K, at 15 ("Petrobras Brazil attempted to unilaterally suspend its EC225 helicopter contracts with Aeróleo . . . commencing April 1, 2013, following the suspension of the use of the EC225 helicopters and alleging that the EC225 helicopters could not meet the terms of the contract. Aeróleo did not receive monthly payments for its EC225 helicopters under contract with Petrobras Brazil from April through late September and October, 2013").

*See e.g.* Prospectus at 1 ("Approximately 71% to 75% of the flying revenue in our Helicopter Services segment was attributable to fixed monthly charges for the fiscal years ended April 30, 2011, 2012 and 2013."), 52 (same), 55 (same), 102 (same). As Helicopter Services made up 90% of CHC's consolidated revenues, and fixed monthly charges 71%-75% of Helicopter Services revenues, such fixed monthly charges therefore accounted for approximately 65% of CHC's consolidated revenues.

133. The clear implication of these disclosures was that the contract structure removed much of the uncertainty from CHC's business that CHC would otherwise face from servicing the oil and gas industry.

134. In fact, Defendants' Roadshow Presentation confirmed the clear implication of the Prospectus description of the contract structure, as the Roadshow Presentation touted the "financial visibility" into CHC that it purportedly allowed CHC investors to enjoy. *See* Roadshow Presentation at 8 ["Key Investment Highlights" slide], 19 ["Disciplined Growth: Financial Visibility" slide], and 28 ["Key Takeaways" slide]. Indeed, this matter – the "**Financial visibility** afforded by long-term contracts . . . with a high fixed monthly revenue component" (bold and underling in *original*) – was one of four points that Defendants proffered as "Key Investment Highlights" at the beginning of the Roadshow Presentation, and "Key Takeaways" at its end. *Id*. at 8 and 28. In between, detailing this point, Defendants explained that CHC boasted "[s]table revenues backed by long-term contracts," with "73% of flying revenue" received in the form of "fixed monthly charges." *Id*. at 19.

135. This implication is further confirmed by Defendant Hooper's presentation to CHC analysts and investors later in the Class Period (quoted above at ¶ 75), in which she noted the "tremendous amount of forward revenue and profit visibility" CHC enjoyed by having "about 75% of the revenue tied up in what we call a monthly standing charge . . . a fixed revenue stream irrespective of whether we fly."

136. The above-specified statements in the Registration Statement concerning the monthly standing charges were materially misleading, because they omitted to also disclose the

Petrobras nonpayment and Petrobras dispute. Indeed, both the Petrobras nonpayment and Petrobras dispute arose from the refusal to CHC's largest customer to pay a single penny of such "fixed" standing charge fees on EC225-related contracts.

137. Again, Defendants' representations and omissions concerning CHC's monthly standing charges can be directly and instructively compared to the disclosures in CHC's competitors' SEC filings concerning the very same charges. *See* Section VI.E, *infra*, and, specifically, ¶¶ 180-90 and 195, *infra*.

a. Defendants' disclosures highlighted the size, security and benefits of the monthly standing charges, *while omitting to disclose that CHC's largest customer had refused to pay such fees in connection with EC225-related contracts*.

b. CHC's competitors' disclosures, again by contrast, while also noting the size and *general* security of the companies' monthly standing charge fees, *also added the relevant and specific facts that certain customers were refusing to make timely, full or any payments of such fees on EC225-related contracts*. *See* ¶¶ 180-90 and 195, *infra.*[11]

[11] *See e.g.* Era May 10, 2013 Prospectus ("Petrobras Brazil recently notified Aeróleo and the other operators in Brazil that it would pay 100% of the monthly rate through the end of March 2013 and then unilaterally suspend all EC225 contracts during the suspension of the use of the EC225 helicopters, alleging that the helicopter cannot meet the terms of the contract."); Era November 13, 2013 Form 10-Q, at 29-30 (". . . Aeróleo did not receive payments for its EC225 helicopters under contract with Petrobras Brazil from April through late September and October 2013."); Bristow February 4, 2013 Form 10-Q, at 19 and 42 ("Currently, no contracts have been cancelled, and we believe we have the contractual right to continue to receive the monthly standing charges billed to our clients. However, in certain instances we are not receiving payment for the monthly standing charges in a timely manner, and we are in discussions with our clients regarding these charges."); Bristow May 23, 2013 Form 10K, at 97 ("Currently, no contracts have been cancelled and we believe we have the contractual right to continue to receive monthly standing charges billed to our clients. However, in certain instances we have agreed to a reduced monthly standing charge billings for the affected aircraft. . . [T]he reduced charges did not have a material impact on our results of operations for fiscal year 2013.").

### 4. The Registration Statement's Disclosures Concerning the EC225 Grounding Did Not Disclose the Omitted Facts or Correct the Misleading Statements

138. The Registration Statement contained multiple disclosures concerning the EC225 grounding and certain of its potential or actual consequences to CHC in the "Recent Developments," "Risk Factors" and "Management Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") sections of the Prospectus. Such disclosures were requisite pursuant to, *inter alia*, Item 11A of Form S-1, 17 C.F.R. § 229.503(c), and 17 C.F.R. § 229.303(a)(3)(i)-(ii) and (b). None of these passages, however, disclosed the facts alleged here to have been omitted, or corrected in any way the statements alleged here to have been misleading.

139. First, the Prospectus first referred to the EC225 grounding in its "Recent Developments" section, which stated, in relevant part:

> **Recent Developments**
>
> Following an incident in October 2012 that led to the temporary industry-wide suspension of all over-water flights by Eurocopter EC225 helicopters, in July 2013, we commenced the phased re-introduction of our EC225 fleet to full service. We have now resumed commercial service on the Eurocopter EC225 fleet.

*See* Prospectus, at 12.

140. The above-specified disclosure omitted to disclose that, as a result of the EC225 grounding and notwithstanding the EC225 return to service, CHC's largest customer, Petrobras, had refused to pay monthly standing charges on EC225-related contracts from April 2013 through as late as December 2013, and that consequently, CHC was currently embroiled in formal dispute with Petrobras concerning such nonpayment of monthly standing charges.

141. Moreover, while Defendants represented that CHC EC225s had begun to return to service in July 2013, Defendants omitted to disclose that in Brazil, where CHC's largest customer Petrobras was located, EC225s remained grounded for as many as five more months –

until December 2013. This was clearly material in light of the Petrobras nonpayment and Petrobras dispute (which were also undisclosed).

142. Defendants' above-specified "Recent Developments" disclosure can be directly and instructively compared to similar disclosures in CHC's competitors' SEC filings concerning exactly the same matter. *See* Section VI.E, *infra*, and, specifically, ¶¶ 182, 188 and 195-96, *infra*.

a. Defendants' disclosure was cursory, noting merely that the EC225 grounding had occurred (and was now over, superseded by the EC225 return to service), without disclosing any *particular* recent developments arising from the EC225 grounding, such as Petrobras' refusal to pay monthly standing charges and CHC's dispute with Petrobras.

b. CHC's competitors' disclosures, in exactly the same "Recent Events" Section of their SEC filings, were, by contrast, highly detailed, disclosing, among many other things, the degree to which CHC's competitors had continued to receive monthly standing charges during the EC225 grounding, as well as those instances where their large customers had refused to pay such charges in full or at all. *See* ¶¶ 182, 188 and 195-96, *infra*.[12]

143. Second, the Prospectus made multiple references to the EC225 grounding in its "Risk Factors" section, which stated in relevant part:

[12] *See e.g.* Era November 13, 2013 Form 10-Q, at 29-30 (disclosing, *inter alia*, that Era had three EC225s contracted to Petrobras but "did not receive payments for its EC225 helicopters under contract with Petrobras Brazil from April through late September and October 2013."); Bristow November 7, 2013 Form 10-Q at 43-44 ("Currently, no client contracts have been cancelled in connection with the suspension in operation of the EC225 aircraft . . . and we believe we have the contractual right to continue to receive monthly standing charges billed to our clients. In certain instances we have agreed to reduced monthly standing charge billings for the affected aircraft. We have been able to substantially replace the lost utilization from the EC225 aircraft with other aircraft, mitigating the impact on our results of operations for the Current Quarter and Current Period").

**Operating helicopters involves a degree of inherent risk and we are exposed to the risk of losses from safety incidents**.

Hazards, such as helicopter accidents, adverse weather conditions, darkness, collisions and fire are inherent in furnishing helicopter services and can result in personal injury and loss of life, accidents, reduced number of flight hours, severe damage to and destruction of property and equipment and suspension of operations or grounding of helicopters. For example, on October 22, 2012, one of our EC225 helicopters made a controlled water landing in the North Sea with no injuries to crew or passengers. All flights of all operators using the same type of helicopter were subsequently suspended for the duration of a lengthy investigation and corrective action from the manufacturer. . . In addition to any loss of property or liability associated with helicopter crashes, our revenue, profitability and margins would decline to the extent any of our helicopters were voluntarily or mandatorily grounded. While we seek to mitigate the financial impact of such risks and preserve our rights through commercial and other arrangements with all those involved, when available, these mitigation efforts may not be successful or available for all incidents. Our performance, profitability and margins may fluctuate from period to period as a result of such incidents and our mitigation efforts.

* * *

**Our fixed operating expenses and long-term contracts with customers could adversely affect our business under certain circumstances**.

Our profitability is directly related to demand for our helicopter services. Because of the significant expenses related to helicopter financing, crew wages and benefits, lease costs, insurance and maintenance programs, a substantial portion of our operating expenses are fixed and must be paid even when certain helicopters are not actively servicing customers and thereby generating income. A decrease in our revenues could therefore result in a disproportionate decrease in our earnings, as a substantial portion of our operating expenses would remain unchanged. Similarly, the discontinuation of any rebates, discounts or preferential financing terms offered to us by helicopter manufacturers would have the effect of increasing our fixed expenses, and without a corresponding increase in our revenues, would negatively impact our results of operations. We expect our maintenance costs to increase to a level comparative to normal activity as the EC225 has returned to commercial operations. Nonetheless, no assurance can

> be given that our costs will be comparable on a period to period basis, particularly when incidents may impact our helicopters.
>
> * * *
>
> **We depend on a small number of helicopter manufacturers**.
>
> . . . If any of the helicopter manufacturers we contract with, or the government bodies that regulate them, identify safety issues with helicopter models we currently operate or that we intend to acquire, we may be unable to operate a portion of our fleet or could experience a delay in acquiring new helicopters, both of which would negatively affect our business. For example, in October 2012, one of our EC225 helicopters made a controlled water landing in the North Sea with no injuries to crew or passengers. All flights of all operators using the same type of helicopter were subsequently suspended for the duration of a lengthy investigation and corrective action from the manufacturer. In August 2013, one of our AS332L2 helicopters was involved in an accident in the North Sea, resulting in four fatalities, see "—Risks Related to Our Business and Industry—Operating helicopters involves a degree of inherent risk and we are exposed to the risk of losses from safety incidents." The cause of the August 2013 accident is not yet known. Regulatory investigations and political debate are currently in process or planned in the United Kingdom. The AS332L2 and the EC225 are produced by the same manufacturer, and we operate other helicopter types by this manufacturer (as of October 31, 2013, 85 helicopters in total), which total represents approximately 36% of our entire fleet. If it is ever determined that a safety issue exists across one or more model types by the same manufacturer, we may be required to suspend flight operations of a significant and material portion of our fleet.
>
> If we are unable to fully resume operations with the AS332L2 or EC225, or are forced to suspend operations of different helicopter models, our business, financial condition and results of operations during any period in which flight operations are suspended could be affected.

*See* Prospectus at, respectively, 24, 25 and 25-26 (bold in original).

144. The above-specified "Risk Factors" disclosures omitted to disclose that, as a result of the EC225 grounding and notwithstanding the EC225 return to service, CHC's largest customer, Petrobras, had refused to pay monthly standing charges on EC225-related contracts from April 2013 through as late as December 2013, and that consequently, CHC was currently

embroiled in formal dispute with Petrobras concerning such nonpayment of monthly standing charges. While each of the above-specified "Risk Factors" made generalized disclosures concerning *hypothetical* or *possible* material negative effects that "*may*" or "*could*" accrue to CHC in the event of being unable to fly certain of its helicopters, such as the event of the EC225 grounding, all omitted to disclose that actual, material negative effects had concretely occurred as a result of the EC225 grounding: namely, the Petrobras nonpayment and Petrobras dispute.

145. Again, Defendants' above-identified Registration Statement "Risk Factor" disclosures can be directly and instructively compared to analogous risk disclosures made under analogous captions by CHC's competitors in their own SEC filings. *See* Section VI.E, *infra*, and, specifically, ¶¶ 179 and 190 *infra*.

a. Defendants' disclosures were generalized, hypothetical, abstract and devoid of any specifics that disclosed, or allowed CHC investors to independently assess, the fact or extent of any actual materialization of the generalized risk described (a helicopter grounding generally and/or the EC225 grounding particularly).

b. CHC's competitors' disclosures, by contrast, were highly detailed, disclosing, among many other things, the degree to which CHC's competitors had continued to receive monthly standing charges during the EC225 grounding, as well as those instances where their large customers had refused to pay such charges in full or at all. *See* ¶¶ 179 and 190 *infra.*[13]

146. Third and lastly, the Prospectus made multiple references to the EC225 grounding in its MD&A section, comparing CHC's results of operations for the six month period ended October 31, 2013 (*i.e.*, the first half of CHC's fiscal 2014 year) with the year-earlier same period

---

[13] *See e.g.* Era March 21, 2014 Form 10-K, at 12 (risk factor directly comparable to Prospectus "Risk Factor" concerning the risk of helicopter "safety incidents," *but adding extensive particularized disclosures concerning various actual consequences of the EC225 grounding*, including that Era had three EC225s contracted to Petrobras, that Petrobras had continued "to pay the full contracted monthly rate" through March 2013, but that Era "did not receive monthly payments for its EC225 helicopters under contract with Petrobras Brazil from April through late September and October, 2013.").

(*i.e.*, the six month period ended October 31, 2012). *See* Prospectus at 60-62, 65-66. Half of these references related to increased costs in the most recent period, arising from work performed in preparing EC225s for the EC225 return to service and "higher maintenance activity on helicopters used as replacements during the EC225 stand-down." *Id.* at 62 and 66. The other half related to the EC225 grounding's effects on CHC revenues in the most recent period, disclosing *inter alia* that "total external revenue for Helicopter Services was relatively flat compared to the prior year period, with the results for the overall period influenced by the continued suspension of the EC225." *Id*. at 60; *see also* 60-61 and 65 (disclosing variances in regional revenues, including in Europe, the Americas, and the Asia Pacific regions, in the earlier and later periods).

147. The above-specified MD&A disclosures relating to the EC225 grounding were the most – and the *only* – specific disclosures in the Registration Statement concerning the EC225 grounding's financial and operational impacts on CHC. Yet these statements too, while disclosing certain isolated impacts that the EC225 grounding had on CHC revenues, still omitted to disclose the Petrobras nonpayment and/or the Petrobras dispute, and that CHC had not been receiving monthly standing charge payments (the 70%-75% of the contract amount that was purportedly guaranteed irrespective of Petrobras' actual usage of CHC's services) from its largest customer, Petrobras, on EC225-related contracts. Additionally, and, as further discussed immediately below in Section VI.C.5, *infra*, Defendants' MD&A disclosures omitted further material facts concerning the effects of the EC225 grounding to CHC.

148. Again, Defendants' above-identified Registration Statement MD&A disclosures can be directly and instructively compared to the MD&A disclosures made by CHC's competitors in their own SEC filings. *See* Section VI.E, *infra*, and, specifically, ¶¶ 182-88 and 195-96, *infra*.

a. Defendants' disclosures, in addition to omitting the elephant in the room (namely, the Petrobras nonpayment and the Petrobras dispute), also omitted any description of the room itself (*i.e.*, how the EC225 grounding had impacted CHC's fleet and

operations, as well as CHC's operational responses to the EC225 grounding, which were necessary in order to understand the isolated and unexplained financial specifics that Defendants did disclose).

b. CHC's competitors' disclosures, by contrast, were highly detailed, including, in addition to the degree to which their customers had continued to make full, timely, reduced or any monthly standing charge payments on EC225 contracts, further information detailing and explaining exactly how many EC225s had been grounded where, and for how long, what the companies were doing to provide alternative transportation solutions to their EC225-deprived customers, and the contributions that these negative and positive operational developments made to the companies' reported financial results. *See* ¶¶ 182-88 and 195-96, *infra*.

### 5. The Registration Statement Made Materially Misleading Disclosure Concerning the Operational and Financial Consequences to CHC of the EC225 Grounding

149. Defendants' above-detailed affirmative statements in the Registration Statement concerning the EC225 grounding – *i.e.*, the above-detailed disclosures in the Recent Developments, Risk Factors and MD&A sections of the Prospectus – omitted material facts necessary to provide CHC investors with adequate understanding of how the EC225 grounding had affected CHC.

150. Specifically, Defendants negligently omitted to disclose in the Registration Statement, facts necessary and sufficient for adequate understanding of the operational and financial impacts of the EC225 grounding to CHC, including:

a. the number and location of CHC's grounded EC225s, and the duration of their respective groundings;

b. the reaction of CHC's key customers to the EC225 grounding, including whether and to what extent its customers were continuing to pay monthly standing charges on EC225 contracts; and

c. CHC's operational reaction to the EC225 grounding, including whether CHC had managed to provide alternative transportation solutions for its EC225-deprived customers, and whether and to what extent the revenue that CHC received for such alternative services replaced the revenues payable under the original EC225 contracts.

151. Instead, the Registration Statement merely disclosed:

a. an unspecified number EC225s had been grounded for unspecified periods of time beginning in October 2012 and continuing through a "phased in" return to service between July 2013 and the date of the IPO (per the Prospectus's "Recent Developments" disclosures);

b. that the EC225 grounding was the sort of event that *could* have a material impact on CHC's revenues and earnings (per the Prospectus's "Risk Factors" disclosures) – although, given Defendants' "Recent Developments" disclosure that the EC225 grounding had ended and the EC225 return to service had been effected, coupled with Defendants' omissions, it appeared that any such material impact had already been experienced and reported, and no further material impact could be expected; and

c. certain isolated revenue and cost impacts attributed to the EC225 grounding (per the Prospectus's MD&A disclosures) – but unaccompanied by explanation of the underlying operational drivers (*e.g.*, how the EC225 grounding had impacted CHC's fleet and operations, as well as CHC's operational responses to the EC225 grounding) necessary to understand the isolated and unexplained financial specifics that Defendants did disclose.

152. As a result of Defendants' inadequate disclosures concerning the effects of the EC225 grounding on CHC, such effects remained in material part a "black box" to CHC investors.

153. In this too, Defendants' Registration Statement disclosures can be directly and instructively compared to the contemporary disclosures made by CHC's competitors' concerning the very same matter – the effects of the EC225 grounding. *See* Section VI.E, *infra*. CHC's competitors provided detailed, extensive and timely disclosures as to, *inter alia,* the number of EC225s grounded, the exact duration of their grounding, the manner in which such EC225s did and did not continue to generate revenues, the manner in which the competitors had responded operationally to the EC225 grounding, and how and to what extent the revenues and expenses associated with such operational responses mitigated the revenues lost on EC225 contracts as a result of the EC225 grounding. *Id.*

154. The combined detail, breadth and significance of CHC's competitors' disclosures operated to render the effects of the EC225 grounding on CHC's competitors an open book, rather than a black box.

**6. Materiality**

155. Defendants' above-detailed omissions of fact and misleading statements were *material*, for several reasons.

156. First, concrete, real-world and *prima facie* demonstration of materiality is provided here by the market's reactions to the CHC Defendants' disclosures on March 12, 2014 and July 9-10, 2014, revealing respectively some of the effects of the Petrobras nonpayment in March (without revealing the cause of those effects – *i.e.*, the nonpayment) and, finally, in July, the nonpayment itself (*see* Section VI.D, *infra*). Immediately following these two disclosures, CHC shares suffered their two largest single-day price declines in CHC's entire existence, to this day, as a publicly-traded company. This indicates that, during such period (*i.e.*, CHC's existence as a publicly-traded company, from January 17, 2014 to this day), *no disclosures were more material than these* – or, more precisely, that no disclosures before or since *diverged so materially and negatively from extant market understanding of CHC*.

157. The price reactions to these two disclosures – $1.19 per share following the March 12, 2014 disclosure, and $0.99 per share following the July 9-10, 2014 disclosure – combined to erase nearly 25% of the $10.00 valuation enjoyed by CHC shares in CHC's IPO, and confirm the materiality of this information.

158. Second, Defendants' own representations in the Prospectus indicate that the omitted information – which directly impacted CHC's "sales, earnings and certain other financial and operating information in recent periods" as well as CHC's "future prospects" – was relevant to Defendants' determination of the price at which to offer and sell shares in the IPO:

> **Pricing of the Offering**
>
> Prior to this offering, there has been no public market for our ordinary shares. *The initial public offering price has been determined by negotiations between us, First Reserve and the representatives. Among the factors considered in determining the initial public offering price were our future prospects* and the future prospects of our industry in general, *our sales, earnings and certain other financial and operating information in recent periods*, and the price-earnings ratios, price-sales ratios, market prices of securities and certain financial and operating information of companies engaged in activities similar to ours.

*See* Prospectus at 186 (bold in original, italics added for emphasis).

159. Third, Defendants' own representations in the Prospectus concerning Petrobras, CHC's relationship with Petrobras, and the status of CHC's contracts with Petrobras – specified and quoted above at ¶¶ 124-28 – themselves indicate that the omitted matters, which concerned CHC's contracts and relations with Petrobras, were material to CHC, CHC's finances and CHC investors.

160. Fourth, Defendants' own representations in the Prospectus and the Roadshow Presentation concerning the size, importance and benefits of the revenues that CHC received in the form of fixed monthly standing charges further indicate that omission of the Petrobras nonpayment (of exactly such fees) was material.

161. Specifically, the Prospectus and the Roadshow Presentation contained representations emphasizing the importance and benefits of:

a. the "[f]inancial visibility" and "[s]table revenues" afforded by CHC's "long-term contracts" to provide transportation services to "blue chip oil and gas customers;"

b. the increased financial/revenue "visibility" and "stab[ility]" further resulting from providing transportation services to such customers for their *production*, rather than *exploration and development*, operations (as production work on existing wells was more certain and less cyclical than work to find and develop new wells); and

c. the increased financial/revenue "visibility" and "stab[ility]" resulting from the "high fixed monthly revenue component" of such contracts, under which "73% of flying revenue is fixed monthly charges."

*See* Roadshow Presentation at 8 ["Key Investment Highlights" slide] and 19 ["Disciplined Growth: Financial Visibility" slide]; *see also* Prospectus at 1, 8, 52, 55, 102, 109 and F-11.

162. Indeed, the CHC Defendants repeatedly emphasized this matter when presenting to CHC analysts and investors. *See e.g.* ¶ 75, *supra* (Defendant Hooper's May 22, 2014 remarks at the UBS Global Oil and Gas Conference, touting the "tremendous amount of forward revenue and profit visibility" that CHC enjoyed from such "fixed revenue stream," wholly "irrespective of whether we fly.").

163. In sum, Defendants emphasized the high "[f]inancial visibility" resulting from the fact that the overwhelming majority of CHC revenues derived from "fixed monthly charges" payable to CHC, month after month, without any CHC helicopters having to fly at all. Yet it was exactly these "fixed monthly charges" that formed the heart of the Petrobras nonpayment and Petrobras dispute – and that, *invisibly* to Plaintiffs and Class, were *not* accruing to CHC as a result of the Petrobras nonpayment (precisely because CHC EC225 helicopters were *not* flying).

164. Fifth, further disclosures in the Registration Statement's "Recent Developments" section concerning the EC225 grounding and EC225 return to service, further indicate and admit

that such matters were material, as the "Recent Developments" section is set aside for *material* matters that post-date the time periods covered by audited financial statements.

165. Sixth, Defendants' above-detailed omissions were material because, over and above Defendants' omissions of material fact concerning the Petrobras nonpayment and the Petrobras dispute, such omissions made it impossible for CHC analysts and investors, including Plaintiffs and the Class, to understand the EC225 grounding's effects on CHC, or conduct any independent assessment of such effects.

**D. Post-IPO Disclosures Reveal the Registration Statement's Material Misrepresentations and Omissions**

**1. March 12, 2014**

166. Shortly after the close of market trading on March 12, 2014, CHC issued a press release, titled "CHC Group Reports Fiscal-2014 Q3 Operating Results, Provides Guidance for Full-Year Performance" disclosing CHC's financial results for the third fiscal quarter of 2014 (ended January 31, 2014), and providing "guidance" concerning results expected for the full year of fiscal 2014, ending April 30, 2014 (the "Fiscal 2014 Guidance").

167. The results for the third fiscal quarter of 2014 – 3% revenue growth versus the year-ago quarter, and 1% EBITDAR decline – were paralleled by the Fiscal 2014 Guidance, calling for fiscal 2014 revenue to be "flat to slightly up" versus fiscal 2013, while adjusted EBITDAR would be "flat to slightly down." The CHC Defendants attributed both the lackluster third quarter results and the lackluster Fiscal 2014 Guidance to "the negative effect of the suspension and subsequent return to service of the EC 225." *See* CHC March 12, 2014 press release, at 3; CHC March 12, 2014 conference call transcript, at 8 (in which Defendant Hooper explained that "For the year, we are targeting revenue to be flat to slightly up versus fiscal '13 and for EBITDAR . . . to be flat to slightly down. This guidance reflects the full year net impact of the EC225 suspension and subsequent return to service.").

168. The third quarter results and Fiscal 2014 Guidance released on March 12, 2014 revealed, although only vaguely and in part, certain of the continuing, negative financial *effects*

to CHC of the EC225 suspension and Petrobras nonpayment. Such correction was only partial, however, because the substantial and root *cause* of such effects, the Petrobras nonpayment and Petrobras dispute, were *not* disclosed, and remained *undisclosed* until July 10, 2014. The March disclosure gave investors no indication that the disappointing financial guidance resulted in part from conditions that had been omitted from the Prospectus (*i.e*., the Petrobras nonpayment). The Fiscal 2014 Guidance disclosed on March 12, 2014, although purportedly reflecting "the full year net impact of the EC225 suspension," *in fact did not fully reflect the net impact of the EC225 suspension*, which was not disclosed until July 10, 2014.

169. Consequently, and notwithstanding the CHC Defendants' March 12, 2014 disclosures, the Registration Statement's materially misleading statements and material omissions remained operative in substantial part, and were only corrected by the CHC Defendants' subsequent disclosures on July 9-10, 2014.

**2. July 9-10, 2014: The Petrobras Nonpayment is Finally Revealed**

170. Shortly after the close of market trading on July 9, 2014, CHC issued a press release, titled "CHC Group Provides Fiscal-2015 Long-Term Guidance, Reports Fiscal-2014 Full-Year, Fourth-Quarter Operating Results," disclosing, *inter alia*, that CHC's financial results for fiscal 2014 (ended April 30, 2014) had materialized at the low end of CHC's previously-stated 2014 Financial Guidance.

171. Beginning at 8 a.m. on July 10, 2014, before market trading opened for the day, CHC conducted a conference call with analysts and investors to discuss its results of operations for the fourth quarter and fiscal year ended April 30, 2014, and to answer questions raised by call participants.

172. During CHC's July 10, 2014 conference call, Defendant Hooper disclosed what Defendants had previously omitted from the Registration Statement (and from CHC's subsequent Class Period disclosures) – namely, the Petrobras nonpayment, which had begun in April 2013, more than nine months prior to the IPO – and identified such nonpayment as the

reason why CHC's 2014 financial results had materialized at the low end of the 2014 Financial Guidance:

> **<u>Joan Hooper - CFO</u>**
>
> . . . Total revenue was $453 million in the quarter and $1.77 billion for the full year, up 1% over last year. . .
>
> Consolidated EBITDAR was $132 million in the fourth quarter and $471 million for the year, down 3% year-over-year. As we've previously discussed, the EC225 suspension adversely affected our results in fiscal '14 because of lost revenue, additional cost to return the aircraft to service, increased maintenance and ongoing inspection expenses. During this challenging time for the industry, most customers continued to pay their monthly standing charges to the operators.
>
> *However, starting in April of 2013, one of our customers, Petrobras, stopped making payments on contracts to CHC and other operators of 225s in Brazil until overwater flights with those aircraft resumed.*
>
> *When we provided guidance for fiscal 2014 we included the recovery of certain payments from this customer because we were in the midst of discussions with them and had a high confidence level we would favorably conclude those discussions in fiscal '14. However, this did not happen in Q4 as expected, resulting in both revenue and EBITDAR falling at the lower end of our guidance ranges.*
>
> * * *
>
> . . . As I mentioned, this was not unique to CHC; this was an action they took against all operators with the 225 . . .

*See* transcript of CHC's July 10, 2014 conference call ["CHC 2014 Conference Call"], at 5 and 10 (italics added for emphasis).

173. CHC's July 9-10, 2014 disclosures corrected the Registration Statement's materially misleading statements and material omissions, by disclosing the Petrobras nonpayment to CHC, which had begun in April 2013 – more than 9 months prior to the IPO and to Registration Statement becoming effective – and the Petrobras dispute.

### E. Contemporary Public Disclosures Made by CHC's Peers, Era and Bristow, Concerning the EC225 Suspension and its Effects

174. Examination of the disclosures made by Era and Bristow on the same topic (namely, the EC225 grounding and its effects), and at the same time, reveals that Era and Bristow, unlike CHC, provided transparent, detailed and timely disclosure to the market concerning the EC225 grounding and its effects, including, among many other things detailed below, the degree to which their largest customers continued to make timely, full, reduced or indeed *any* monthly standing charge payments on EC225 contracts.

175. Importantly, such comparison also demonstrates that the poor quality of Defendants' disclosures concerning CHC alleged herein was not the rule, but the *exception*. Defendants' disclosures to CHC investors in the Registration Statement did not live up to actual disclosure practices then employed in the same industry concerning the same exact matters.

#### 1. Era's Disclosures

##### a. Overview

176. At all times relevant hereto, Era functioned as one of the largest helicopter operators in the world (although significantly smaller than CHC and Bristow). Era's operations were largely focused in the U.S., from which it earned more than 70% of its operating revenues, but it also had significant operations in various foreign countries, including most prominently Brazil, where it operated through its local affiliate Aeroleo. Era's fleet of helicopters included multiple EC225s, and Era's roster of customers included Petrobras, which accounted for up to 6% of Era's annual revenues (*i.e.*, an amount making Petrobras a *less* material customer to Era than to CHC, which derived 14% of annual revenues from Petrobras). *Compare* Era Form 10-K filed with the SEC on February 28, 2013 ("Era 2012 10-K") at 13 and CHC Prospectus at 8.

177. Notwithstanding that Petrobras was far less material to Era than to CHC, Era provided far more detailed disclosures than CHC concerning the EC225 grounding, the reaction of customers, including Petrobras specifically, to such grounding, and the operational and financial effects of such reactions. Specifically, and as detailed below, Era progressively

disclosed, between February 2013 and March 2014, in SEC filings and periodic conference calls with analysts and investors:

a. that although most customers affected by the EC225 continued to pay the fixed monthly standing charges per contract, customers were not paying any variable flight charges, which depended on actual flight operations, because the EC225s were not flying (*see e.g*. Era 2012 10-K at 11);

b. that in early 2013, Petrobras had informed Era it would no longer pay the full fixed monthly sums, but rather discounted sums, and that it might terminate its contracts relating to EC225 helicopter services (*see e.g*. Era 2012 10-K at 11, 13);

c. that in approximately March of 2013, Petrobras had informed Era that it would pay 100% of the contractual fixed monthly sums through March 2013, but then unilaterally suspend all EC225 contracts from April 2013 onwards until such time as EC225s returned to service, and consequently make no payments under such contracts (*see* Era prospectus on Form 424B(5), filed with the SEC on or about May 10, 2013 ["Era Prospectus"] at 19-20; Era Form 10-Q filed with the SEC on or about May 15, 2013 ["Era Q1 2013 10-Q"] at 23, 32; transcript of Era May 15, 2013 conference call ["Era Q1 2013 Conference Call"], at 4, 7-8);

d. that in April 2013, Petrobras had ceased paying its contractual fixed monthly sums relating to three EC225s provided by Era (*see e.g*. Era Form 10-Q filed with the SEC on or about August 13, 2013 ["Era Q2 2013 10-Q"] at 11, 29-30; transcript of Era August 14, 2013 conference call ["Era Q2 2013 Conference Call"], at 7-9);

e. that such nonpayment by Petrobras had continued through late September and October 2013 (*see e.g*. Era Form 10-Q filed with the SEC on or about November 13, 2013 ["Era Q3 2013 10-Q"] at 12, 29-30; Era Form 10-K filed with the SEC on or about March 21, 2014 ["Era 2013 10-K"] at 12, 15, 34-35; transcript of Era November 13, 2013 conference call ["Era Q3 2013 Conference Call"], at 2);

f. indication of the actual sums that Petrobras owed to Era, but refused to pay, beginning in April 2013 and continuing until the EC225 return to service, under contracts for provision of three EC225s from Era, which Era accounted for and disclosed as "deferred revenue" (*see e.g*., Era Q1 2013 10-Q at 7; Era Q2 2013 10-Q at 7-8; Era Q3 2013 10-Q at 7; Era 2013 10-K at 12, 15); and

g. the financial and operational status of all EC225s operated by Era (*see e.g*. Era Q2 2013 Conference Call, at 2, 7-9; Era Q3 2013 Conference Call, at 2, 8; transcript of Era March 18, 2014 conference call ["Era Q4 2013 Conference Call"], at 2).

**b. Details**

178. On February 28, 2013, Era provided particularized disclosures in the Era 2012 10-K detailing to Era shareholders and investors the still-developing fall-out of the EC225 grounding on Era's operations and finances. The Era 2012 10-K informed, *inter alia*, that: (1) generally, Era was still earning revenues from the fixed payment component of its EC225-related contracts, but was not collecting any hourly revenues "since the helicopters are not flying;" (2) that certain customers had "requested reductions" to the fixed payments they were obligated to make; (3) that one customer, namely Petrobras, which had secured the services of 3 EC225s from Era, had signed an additional contract with Era to secure the services of 4 AW139 helicopters to replace the 3 grounded EC225s; (4) that Petrobras, although having initially continued to pay full fixed payments to Era under the contract for 3 EC225s, had notified not only Era but also "the other helicopter operators in Brazil" that it intended to henceforth pay substantially discounted, rather than full, fixed payment sums; and (5) that Petrobras had provided similar notifications that it was exploring its "ability to terminate all EC225 helicopter contracts, alleging that the helicopter cannot meet terms of the contract." Specifically, the Era 2012 10-K stated in relevant part:

> . . . [T]here have been three recent accidents involving the Eurocopter EC225 helicopter that have resulted in complete losses of the helicopters. One of the helicopters was under contract-lease from us to one of our customers, while the other two were owned

> and operated by parties unrelated to us. In response to these accidents, major global operators have indefinitely suspended EC225 operations. *We are still earning revenues associated with our EC225 helicopters under contract-leases; however, customers have requested reductions in contract-lease payment obligations and we are not collecting hourly revenues, since the helicopters are not flying*. To the extent the EC225 helicopter operations remain suspended for a prolonged period of time, our results of operations could be adversely affected.
>
> . . . In November 2012, in response to an emergency tender issued by Petrobras Brazil as a result of the above noted suspension of use of EC225 helicopters, Aeróleo executed contracts with Petrobras Brazil [for] four AW139 helicopters. *Aeróleo contract-leases three EC225 helicopters from us which are in turn on contract with Petrobras Brazil. Following the suspension of the use of EC225 helicopters in late October 2012, Petrobras Brazil continued to pay the full contracted monthly rate, but it has recently notified Aeróleo and the other helicopter operators in Brazil of its intent to pay each operator only a percentage of the monthly rate going forward, with such percentage based on their respective historical availability of those contracted EC225 helicopters (approximately 80%, in the case of Aeróleo). In addition, Petrobras Brazil also recently notified Aeróleo and the other helicopter operators in Brazil of its position that they believe that they may have the ability to terminate all EC225 helicopter contracts, alleging that the helicopter cannot meet terms of the contract*. Two other competitors in Brazil have a total of nine EC225 helicopters on contract with Petrobras Brazil. Should Petrobras Brazil either terminate their contract with Aeróleo, or should Aeróleo have to agree to a reduced monthly payment, it could necessitate an infusion of capital to allow Aeróleo to continue to operate. Refer to Item 7 of Part II— "Management's Discussion and Analysis of Financial Condition and Operating Results—Offshore Oil and Gas Support" for additional information.

*See* Era 2012 10-K, at 11 (italics added for emphasis).

179. The Era 2012 10-K also contained an additional warning statement, analogous to one in CHC's Registration Statement, to the effect that Era relied "on relatively few customers," one of whom was Petrobras, "for a significant share of our revenues." *See* Era 2012 10-K at 13; compare to CHC Registration Statement (quoted at ¶ 127, *supra*). However, Era's version of this warning statement differed from that provided by Defendants in CHC's Registration

Statement insofar as Era, immediately after identifying Petrobras as one of the Era's largest and most material customers, further disclosed that Petrobras "was considering renegotiation or termination of contracts for certain helicopters." Specifically, the Era 2012 10-K stated in relevant part:

> **We rely on relatively few customers, some of which are our affiliates, for a significant share of our revenues, the loss of any of which could adversely affect our business, financial condition and results of operations**.
>
> We derive a significant portion of our revenues from a limited number of oil and gas exploration, development and production companies and government agencies. Specifically, services provided to Anadarko, U.S. government agencies, primarily the BSEE, a division of the U.S. Department of the Interior, and Aeróleo, *which is highly dependent on Petrobras Brazil, a company which is considering renegotiation or termination of contracts for certain helicopters leased by us to Aeróleo, accounted for 15%, 11% and 6% of our revenues*, respectively, for the year ended December 31, 2012 . . . The loss of business from any of our significant customers could have a material adverse effect on our business, financial condition, liquidity and results of operations.

*See* Era 2012 10-K, at 13 (bold in original, italics for emphasis); see also Era Prospectus, at 22 (same).

180. On May 10, 2013, Era disclosed in the Era Prospectus (which was part of a registration statement filed by Era for an offering of senior notes) similar but further-updated information concerning the EC225 grounding, its effects on Era's operations, Petrobras' developing reactions to such grounding (including Petrobras' intention to cease any and all payments under its EC225 contracts beginning in April 2013), and the potentially material financial consequences to Era of such Petrobras actions. Specifically and in relevant part, the Era Prospectus repeated the disclosure set forth in ¶ 178, *supra*, but added the following sentence to the disclosure:

> *However, Petrobras Brazil recently notified Aeróleo and the other operators in Brazil that it would pay 100% of the monthly rate*

> *through the end of March 2013 and then unilaterally suspend all EC225 contracts during the suspension of the use of the EC225 helicopters, alleging that the helicopter cannot meet the terms of the contract*.

*See* Era Prospectus, at 19-20 (italics added for emphasis).

181. On May 15, 2013, in the Era Q1 2013 10-Q, Era provided refreshed and updated disclosures concerning the EC225 grounding, Petrobras' reaction to it, and the operational and potentially material financial consequences to Era of such matters. Among other things, Era explained:

a. that in most cases, it was continuing to receive fixed payments under its EC225 contracts, but no additional revenues dependent on actual operation of the EC225s – and, instead, was "earning revenue of the medium helicopters being used to replace the EC225 helicopters in support of these customer contracts;" but

b. that in the case of Petrobras, which had declared its intent to stop all payments under EC225 contracts beginning in April 2013, the financial consequences to Era could be material and imminent (*i.e.*, felt in the upcoming quarter, which also was beginning in April 2013).

182. Specifically, the Era Q1 2013 10-Q stated in relevant part:

> **Recent Events**
>
> Recently there have been multiple ditchings of EC225 helicopters that have led major global operators to indefinitely suspend EC225 operations. One of the helicopters was under contract-lease from us to one of our customers, while the other two were owned and operated by parties unrelated to us.
>
> *Currently, none of our EC225 contracts have been cancelled, and we continue to earn revenues associated with our EC225 helicopters under contract-leases. However, we are not collecting revenues on the EC225 helicopters we operate since those helicopters are not flying. Instead, we are earning revenue on the medium helicopters being used to replace the EC225 helicopters in support of these customer contracts*. To the extent the EC225

> helicopter operations remain suspended for a prolonged period of time, our results of operations could be adversely affected.
>
> . . . In early 2013, Petrobras Brazil notified Aeróleo and the other operators in Brazil of its intent to pay each operator only a percentage of the monthly rate going forward, with such percentage based on their historical availability of those contracted EC225 helicopters (approximately 80% for Aeróleo). However, *Petrobras Brazil recently notified Aeróleo and the other operators in Brazil that it would pay 100% of the monthly rate through the end of March 2013 and then unilaterally suspend all EC225 contracts during the suspension of the use of the EC225 helicopters, alleging that the helicopter cannot meet the terms of the contract. . .*

*See* Era Q1 2013 10-Q, at 23 (italics added for emphasis); *see also id.* at 32 (in substance, the same).

183. On May 15, 2013, Era held its inaugural conference call with analysts and investors, featuring Era's chief executive officer Sten Gustafson ("Era CEO Gustafson") and chief financial officer Chris Bradshaw ("Era CFO Bradshaw") to discuss Era's operations and results of operations. During the conference call:

a. Era CEO Gustafson, in his introductory remarks, disclosed the operating locations of Era's nine EC225s, including three in Brazil for Petrobras (and four in the Gulf of Mexico whose services were being replaced by available medium helicopters operated by Era), and noted that while "nearly all of the oil and gas companies have [] continu[ed] to pay the monthly charges on the EC225," some had "challenged these monthly payments," including "[i]n particular, Petrobras," which "recently announced that it would suspend all of their EC225 contracts in Brazil until the aircraft returns to service" – an event that "could adversely impact our results of operations." *See* Era Q1 2013 Conference Call, at 3-4.

b. Era CEO Gustafson responded to numerous analyst questions concerning the EC225 grounding and the Petrobras nonpayment, further discussing the both the possible duration of the EC225 grounding and the possible financial consequences

to Era of the EC225 grounding generally and the Petrobras nonpayment specifically. *See* Era Q1 2013 Conference Call, at 7-8, 11, and 12-13.

184. On August 13, 2013, Era provided updated and detailed disclosures in the Era Q2 2013 10-Q concerning:

a. the financial and operational status of its EC225 fleet (*i.e.*, which EC225s where were earning what sort of revenues, or were being replaced by alternative revenue-generating aircraft);

b. Petrobras' reaction to the EC225 grounding (*i.e.*, complete nonpayment under EC225-related contracts since April 2013); and

c. the prospects and expected timeline for the return to service of EC225s.

*See* Era Q2 2013 10-Q, at 29-30.

185. The Era Q2 2013 10-Q also disclosed updated figures concerning deferred revenues, included deferred revenues stemming from Petrobras' EC225 nonpayments. *See* Era Q2 2013 10-Q, at 7-8.

186. On August 13, 2013, Era held a conference call with analysts and investors, featuring Era CEO Gustafson and Era CFO Bradshaw to discuss Era's operations and results of operations. During the conference call:

a. Era CEO Gustafson explained that EC225s were now beginning a "phased return to service," with two Era EC225s already at work and two more "flying by the end of this month." *See* Era Q2 Conference Call, at 2.

b. Era CEO Gustafson responded to numerous analyst questions concerning the EC225 grounding and the Petrobras nonpayment, further discussing the both the possible duration of the EC225 grounding and the possible financial consequences to Era of the EC225 grounding generally and the Petrobras nonpayment specifically. *See* Era Q2 2013 Conference Call, at 6-10. Indeed, the latter half of the conference call was largely devoted to these topics.

c. As Era's above-detailed disclosures had already provided Era analysts and investors with detailed information on the EC225 grounding's effects on Era's operations, Era's operational responses to the EC225 grounding, and the Petrobras nonpayment, discussion of these matters was informed and detailed, as the following responses by Era CEO Gustafson to questions from Deutsche Bank analyst Kathryn O'Connor and Pressprich analyst Adam Ritzer and illustrate:

> <A - Sten L. Gustafson>: . . . [I]n Brazil, we were notified by Petrobras that effective April 1, so therefore beginning of the second quarter, that they were going to, what they characterized as suspend the contract, and therefore actually not pay us the monthlies at all. Clearly, we're along with the other operators that they've took that approach across the board, we along with the other operators, obviously, dispute that. There'll clearly be a conversation going forward. . .
>
> * * *
>
> <A - Sten L. Gustafson>: *No, no, no. Just to be clear, so let me – let's just go through the math on this. We've got nine EC225s. So, we've got four of them in the Gulf of Mexico, all of which we expect, knock wood, to be working by the end of this month. . . So that leaves five. So, you've got the three in Brazil that we talked about that are on lease to Aeroleo, which Petrobras as of April 1, has not been paying on. So therefore, Aeroleo has not been paying us. That leaves the two in the North Sea. The two in the North Sea have been and are on-lease to two other operators that operate in the North Sea. And frankly, this is not the way we wanted to do it. But it's – frankly, this event has actually validated our leasing strategy, diversification of revenue, because under the terms of the leases, we continue to get paid fully every month regardless of whether they're flying or not, that's – whether they fly or not, that's between the operator and the company that they're serving. In terms of the lease contract, they continue to pay us. And so, throughout this entire period, the lease payments for those two aircraft have been received steadily every month.*

*See* Era Q2 2013 Conference Call, at 7-9 (italics added for emphasis).

187. On November 13, 2013, Era provided updated and detailed disclosures in the Era Q3 2013 10-Q concerning:

a. the financial and operational status of its EC225 fleet (*i.e.*, which EC225s where were earning what sort of revenues, or were being replaced by alternative revenue-generating aircraft);

b. Petrobras' reaction to the EC225 grounding (*i.e.*, complete nonpayment under EC225-related contracts since April 2013 and continuing through September and October 2013, for the duration of the EC225 grounding); and

c. the prospects and expected timeline for the return to service of EC225s in various geographical regions.

188. Specifically, the Era Q3 2013 10-Q stated in relevant part:

> **Recent Events**
>
> **EC225 Helicopters**
>
> In 2012, there were multiple ditchings of EC225 helicopters that led major global operators to suspend EC225 helicopter operations. One of the helicopters ditched was under contract-lease from us to one of our customers, while the other two were owned and operated by parties unrelated to us.
>
> None of our contracts for EC225 helicopters were canceled. *We continued to earn revenues associated with two of our EC225 helicopters under contract-leases in the North Sea throughout the suspension and one of our EC225 helicopters through the scheduled completion date that occurred during the suspension period, after which we relocated the helicopter to our oil and gas operations in the U.S. Gulf of Mexico.*
>
> The suspension of the EC225 helicopters exacerbated financial difficulties for our Brazilian joint venture, Aeróleo, described below. We contract-lease three EC225 helicopters to Aeróleo, which are under contract with Petróleo Brasileiro S.A ("Petrobras Brazil"). *Petrobras Brazil notified Aeróleo and the other operators in Brazil that it would unilaterally suspend all EC225 helicopter contracts effective April 1, 2013 through the duration of the EC225 helicopter suspension, alleging that the helicopter could not meet the terms of the contract. Aeróleo did not receive payments for its EC225 helicopters under contract with Petrobras Brazil from April through late September and October 2013*. . .

> *We did not collect revenues on the EC225 helicopters we operate in the U.S. Gulf of Mexico during the suspension period since those helicopters were not flying. Instead, we earned revenue on the medium helicopters that were used to replace the EC225 helicopters in support of these customer contracts.*

*See* Era Q3 2013 10-Q, at 29-30 (italics added for emphasis).

189. On November 13, 2013, Era held a conference call with analysts and investors, featuring Era CEO Gustafson and Era CFO Bradshaw to discuss Era's operations and results of operations. During the conference call, Era CEO Gustafson included, in his introductory remarks, a detailed discussion of the course of the EC225 grounding and phased in return to service, the operational and financial status of Era's EC225s, and the Petrobras nonpayment:

> Walking through the status of our fleet of nine EC225s, the two we had on lease in the North Sea received full payment on their leases throughout the suspension, and continue successfully to this day. . . Here in the Gulf, all four aircraft are now generating revenue. But the impact of their suspension was significant. . .
>
> In Brazil, where we have three EC225s on lease to Aeroleo, Petrobras only recently began making monthly payments again after they cleared these helicopters to return to service. Aeroleo did not receive any payments for those three aircraft from April 1 through late September and October, which has weakened Aeroleo's financial position and could adversely impact our results of operations. Although Petrobras has cleared the EC225 to return to service in Brazil, they have yet to begin flying the aircraft, which obviously impacts revenue flight hours for this quarter and next.
>
> * * *
>
> [A]gain as we noted the – earlier about the timing of – with regard to the EC225 suspension and Petrobras' response for that, basically paying nothing, not only – obviously, not the flight hours but also nothing on the monthly going back to April. Obviously, as we've noted before, we disagree with their interpretation of that and we are in discussions with them with regard to that . . . [T]he good news is that we are being paid at least the monthlies again. We expect – we have been expecting here any day now for them to go ahead and begin flying it again. But we are at least being paid the monthlies and so, it is going to be a gradual process but certainly in a better spot now than we were even just a month ago.

*See* Era Q3 Conference Call, at 2 and 5.

190. On March 21, 2014, after EC225s had returned to service on a global basis (by December 2013), and after the financial consequences of the EC225 (which Era's above-detailed SEC filings had disclosed in real-time during the prior year) had all materialized, Era provided in the Era 2013 10-K a retrospective lookback of the EC225 grounding, Petrobras' reaction to it (100% nonpayment on all EC225 contracts from April 2013 "through late September and October 2013"), and the financial consequences to Era (up to $21 million in deferred revenues).

> . . . [T]here have been three accidents involving the EC225 helicopter, including two ditchings, that led major global operators to indefinitely suspend EC225 helicopter operations in October 2012. One of the helicopters was under dry-lease from us to one of our customers, while the other two were owned and operated by parties unrelated to us. Airbus Helicopters (formerly Eurocopter), a division of European Aeronautic Defense and Space Company and manufacturer of the EC225 helicopter, through an internal investigation identified the root cause of the EC225 helicopter service failures and implemented engineering solutions, prevention and detection measures to remedy the matters that led to the suspension. In July 2013, the European Aviation Safety Agency (EASA) regulatory authority approved these measures, resulting in the United Kingdom Civil Aviation Authority and the Civil Aviation Authority of Norway lifting operational restrictions. These measures and related regulatory approvals facilitated the return to service of the EC225 helicopter thereafter on a worldwide basis.
>
> *We continued to earn revenues associated with our EC225 helicopters during the suspension under dry-leases; however, as discussed in the next paragraph, one of our lessee's customers attempted to suspend its payment obligations. We did not collect hourly revenues on our EC225 helicopters during the suspension since the helicopters were not flying. We did earn revenue on the medium helicopters used to replace the EC225 helicopters in support of these customer contract obligations*.
>
> . . . In November 2012, in response to an emergency tender issued by Petrobras Brazil as a result of the above noted suspension of use of EC225 helicopters, Aeróleo executed contracts with Petrobras Brazil [for] four AW139 helicopters until termination of the contract on November 30, 2013. These AW139 helicopters are

> scheduled to begin multi-year contracts with Petrobras Brazil commencing in October 2014, but are not currently under contract following the termination of the emergency tender contract. *Aeróleo dry-leases three EC225 helicopters from us which are, in turn, on contract with Petrobras Brazil. Following the suspension of the use of the EC225 helicopters in late October 2012, Petrobras Brazil continued to pay the full contracted monthly rate until Petrobras Brazil attempted to unilaterally suspend its EC225 helicopter contracts with Aeróleo and the other helicopter operators in Brazil for the duration of the suspension of the use of the EC225 helicopters commencing April 2013, alleging that the helicopter could not meet the terms of the contract*. Two other competitors in Brazil have a total of nine EC225 helicopters on contract with Petrobras Brazil. *Aeróleo did not receive monthly payments for its EC225 helicopters under contract with Petrobras Brazil from April through late September and October, 2013 and commenced generating hourly flight revenues thereafter upon the resumption of Aeróleo's EC225 helicopters flight operations for Petrobras Brazil. As of December 31, 2013, we had deferred the recognition of $21.0 million of revenues owed to us by Aeróleo*. Should Aeróleo be unable to fully recover the amount of the suspended payments or encounter any additional financial challenges, it may impede Aeróleo's ability to pay for the equipment leased from us, necessitate an infusion of capital to allow Aeróleo to operate and adversely impact our results of operations.

*See* Era 2013 10-K at 12 (italics added for emphasis); *see also id.* at 15, 34, 35 (similar disclosures concerning Petrobras nonpayment, its duration and its financial consequences to Era).

191. Remarkably, the above-detailed disclosures *provided by Era* offered more information concerning *CHC's* exposure to the Petrobras nonpayment than did Defendants' disclosures made directly to CHC investors and directly concerning CHC.

**2. Bristow's Disclosures**

192. At all times relevant hereto, Bristow functioned alongside CHC as the two largest helicopter operators in the world. Like CHC and Era, Bristow had significant operations in Brazil, where it operated through its local affiliate Lider. Like CHC and Era, Bristow's fleet of helicopters included a significant number of EC225s (in Bristow's case, 20 EC225s as of

September 30, 2013), and Bristow's roster of customers included Petrobras, which accounted for the lion's share of Lider's business.

193. *Unlike* CHC and Era, Bristow had no contracts to operate EC225s for Petrobras: instead, all of Bristow's contracts with Petrobras called for Bristow to provide and operate only S92s. *See e.g*. Bristow fiscal Q3 2013 Earnings Presentation, attached as an exhibit to Bristow's February 5, 2013 Form 8K, at 13 ("Lider operates only S92s in this market."); *see also* transcript of Bristow's February 5, 2013 conference call with analysts and investors for fiscal Q3 2013, at 4 (same).[14] Consequently, Bristow's reliance on S92s in Brazil made the EC225 grounding a non-issue there for Bristow, and allowed Bristow to remain untouched by the Petrobras nonpayment.

194. However, Bristow's large fleet of EC225s still rendered Bristow vulnerable to the potential adverse consequences of the EC225 grounding, including the degree to which Bristow's *other* customers continued to pay their monthly standing charges on EC225-related contracts.

195. Indeed, and as Bristow progressively disclosed in timely and detailed fashion to its investors, *other* Bristow customers:

a. had, initially, continued to make timely and full payments of the monthly standing charges under EC225-related contracts;[15]

b. had, by early 2013, begun to cease making timely and full payment of such monthly standing charges; [16]

---

14 Bristow further disclosed that "Brazil has 12 EC225s affected by [the] current suspension." *See* Bristow Q3 2013 Earnings Presentation at 13; Bristow Q3 2013 Conference Call at 4 (same).

15 *See e.g.*: transcript of Bristow CEO Chiles' December 3, 2012 presentation to analysts and investors at the Dahlman Rose Ultimate Oil Service and E&P Conference, at 3-4 (noting that clients were still paying monthly standing charges, and that the EC225 grounding had had no financial impact on Bristow).

16 *See e.g.*: Bristow February 4, 2013 Form 10-Q, at 19-20 and 42 ("Currently, no contracts have been cancelled, and we believe we have the contractual right to continue to receive the monthly standing charges billed to our clients. *However, in certain instances we are not receiving payment for the monthly standing charges in a timely manner, and we are in discussions with our clients regarding these charges.* . . [T]he lack of timely payment of these

c. had, thereafter, engaged in discussions with Bristow concerning the appropriate amount of payments that should be made, under the circumstances presented by the EC225 grounding generally and their operations and contracts, particularly;[17] and

d. had by May 2013, in certain instances, negotiated agreements with Bristow to accept *reduced* monthly standing charges (*i.e.*, lower than those set forth in the relevant contracts) – but, as Bristow further explained, such reductions were slight and without any material impact to Bristow's results of operations.[18]

---

monthly standing charges did not have a material impact on the results of operations for the three or nine months ended December 31, 2012 . . .").

[17] *See e.g.*: transcript of Bristow November 8, 2012 conference call for fiscal Q2 2013, at 6-7 (describing how Bristow expected to discuss monthly standing charge payments with all of its customers, "develop the scenarios for each client individually" in light of the operational issues they were facing [such as Bristow's ability to provide timely and sufficient alternative transportation services], and ultimately "do the right thing here" without "waving contract terms around"); Bristow February 4, 2013 Form 10-Q, at 19-20 and 42 (quoted in n. 20, *supra*); transcript of Bristow February 5, 2013 conference call for fiscal Q3 2013, at 6-7 (answering analyst questions concerning Bristow's continued receipt of monthly standing charges, sparked by Bristow's February 4, 2013 Form 10-Q disclosures that "in certain instances we are not receiving payment for the monthly standing charges in a timely manner, and we are in discussions with our clients regarding these charges").

[18] *See e.g.*: Bristow May 23, 2013 Form 10-K, at 97 ("Currently, no contracts have been cancelled and we believe we have the contractual right to continue to receive monthly standing charges billed to our clients. *However, in certain instances we have agreed to a reduced monthly standing charge billings for the affected aircraft*. As we have been able to substantially replace the lost utilization from the EC225 Super Puma's with other aircraft, the reduced charges did not have a material impact on our results of operations for fiscal year 2013."); Bristow August 5, 2013 Form 10-Q, at 17 and 39 (same, apart from minute changes in wording, noting that "in certain instances we have agreed to reduced monthly standing charge billings for the affected aircraft" and that as Bristow had "been able to substantially replace the lost utilization from the EC225 aircraft with other aircraft," this had "mitigat[ed] the financial impact"); Bristow November 7, 2013 Form 10-Q at 18 and 44 (same); Bristow February 6, 2014 Form 10-Q at 19 and 49 (same); *see also* transcript of Bristow August 6, 2013 conference call for fiscal Q1 2014, at 3 and 9 (discussing, and answering analyst questions concerning, Bristow's occasional agreements to reduce monthly standing charges, explaining that Bristow agreed to such reductions only where it was able to achieve reduced costs, which reductions could be passed on to Bristow's clients).

196. Additionally, Bristow, like Era but unlike Defendants, provided detailed disclosures that rendered transparent the EC225's grounding effects on Bristow. For example, Bristow progressively disclosed, between October 2012 and March 2014, in SEC filings and periodic conference calls with analysts and investors:

a. *one day after the EC2225 grounding had begun*, the exact number and location of all the EC225s in its fleet that had been rendered inoperative by the EC225 grounding (sixteen, with twelve in Europe and three in Australia – while three other EC225s operating under search and rescue contracts continued to fly);[19]

b. thereafter, on at least a quarterly basis, constantly updated information on the number and location of the grounded EC225s, as well as further particularized information on when such EC225s returned to service;

c. Bristow's operational responses to such grounding (including securing the only available new heavy helicopters on the market, redeploying other available or underutilized aircraft in its fleet, and refurbishing further heavy helicopters that it had recently retired from its fleet), including particularized and updated information on the degree to which Bristow had managed to replace lost EC225 capacity;[20]

d. Bristow's customers' reactions to such grounding (as detailed immediately above in ¶ 195, *supra*); and

e. the financial impacts to Bristow of all the foregoing, which were minimal, because, as Bristow's disclosures made clear:

    i. monthly standing charges mostly continued to be paid in full;

---

[19] *See e.g.* Bristow October 26, 2012 Form 8-K.

[20] *See e.g.* Bristow May 23, 2013 Form 10-K, at 97; Bristow April 10, 2013 presentation at Bristow's April 10, 2013 "analyst day," at 57-58 (appended as an exhibit to a Form 8-K filed with the SEC on the same day, and showing on a daily and/or weekly basis, from October 22, 2012 onwards, the number of operational Bristow aircraft in Aberdeen, where 12 Bristow EC225s were located, had been grounded, and were being temporarily replaced by a variety of other Bristow-supplied aircraft).

ii. in the instances where Bristow had agreed to discount such charges, it had done so because it could achieve cost reductions (which it passed on to its customers in the form of reduced charges);

iii. the favorable pricing Bristow enjoyed from the variable flight charges generated from providing helicopter services to replace lost EC225 capacity largely replaced the flight charges that would have accrued under the EC225 contracts.[21]

.

**COUNT I**

**For Violation of Section 11 of the Securities Act**
**Against All Defendants**

197. Plaintiffs repeat and reallege the allegations set forth above in ¶¶ 1-196 as if set forth fully herein.

198. This Cause of Action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against all Defendants.

199. As set forth more specifically above, the Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to render the statements made not misleading, and omitted to state material facts required to be stated therein.

200. The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

201. CHC was the registrant for the IPO, and, as issuer of the registered CHC shares, is strictly liable to Plaintiffs and the Class for the material misstatements and omissions in the Registration Statement.

---

[21] *See e.g.* transcript of February 5, 2013 Bristow conference call for fiscal Q3 2013, at 6-7 (detailed discussion); transcript of Bristow CEO Chiles' September 11, 2013 presentation to analysts and investors at the Barclays CEO Energy Conference, at 3-4; Bristow May 23, 2013 Form 10-K, at 97.

202. Each of the other Defendants is also liable to Plaintiffs and the Class for such misstatements and omissions in the Registration Statement as: (a) each of the Individual Defendants signed the Registration Statement; and (b) each of the Underwriter Defendants was an "underwriter," as that term is used in Section 11(a)(5) of the Securities Act, with respect to the IPO and the CHC shares issued, offered and sold through the Registration Statement.

203. Plaintiffs and other members of the Class acquired CHC shares in the IPO and/or pursuant or traceable to the Registration Statement.

204. At the time of their purchases of CHC shares, Plaintiffs and other members of the Class were without knowledge of the Registration Statement's material misstatements of fact and/or material omissions, and could not have reasonably discovered those facts prior to the post-IPO disclosures that subsequently revealed them.

205. By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

206. This claim was brought within one year after discovery of the untrue statements and omissions in the Registration Statement, and within three years after CHC shares were sold to the Class in connection with CHC's IPO.

## COUNT II

### For Violation of Section 12(a)(2) of the Securities Act Against All Defendants

207. Plaintiffs repeat and reallege the allegations set forth above in ¶¶ 1-206 as if set forth fully herein.

208. This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act against all Defendants.

209. Defendants were sellers, offerors, and/or solicitors of sales of the CHC shares offered, issued and sold in the IPO pursuant to the Registration Statement.

210. Defendants' acts of solicitation included:

a. participating in the preparation of the false and/or misleading Registration Statement;

b. participating in efforts to market the CHC shares to be offered in the IPO to investors, including participating in the Roadshow; and

c. signing the Registration Statement.

211. By means of the Registration Statement, and by using the means and instrumentalities of interstate commerce and the U.S. mails, Defendants solicited and sold CHC shares to Plaintiffs and the Class.

212. Plaintiffs and other members of the Class purchased CHC shares in the IPO pursuant to the Registration Statement.

213. As set forth more specifically above, the Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

214. At the time Plaintiffs and other Class Members purchased their CHC shares, Plaintiffs and other members of the Class did not know, and in the exercise of reasonable diligence could not have known, of the material misstatements of fact, material omissions and/or materially misleading statements contained in the Registration Statement.

215. Accordingly and by reason of the misconduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act and are liable to Plaintiffs and member of the Class who purchased CHC shares pursuant to the Registration Statement, each of whom has been damaged as a result of such violation.

216. Members of the Class who have retained their CHC shares have the right to rescind and recover the consideration paid for such shares, and hereby elect to rescind and tender such shares to Defendants. Members of the Class who have sold their CHC shares seek damages to the extent permitted by law.

217. This claim was brought within one year after discovery of the untrue statements and omissions in the Registration Statement, and within three years after CHC shares were sold to the Class in connection with CHC's IPO.

**COUNT III**

**For Violation of Section 15 of the Securities Act**
**Against the Individual Defendants**

218. Plaintiffs repeat and reallege the allegations set forth above in ¶¶ 1-217 as if set forth fully herein.

219. This Cause of Action is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

220. At all times relevant hereto, the Individual Defendants acted as and were control persons of CHC within the meaning of Section 15 of the Securities Act. Because of their positions of control and authority as officers, directors and/or controlling shareholders of CHC, the Individual Defendants had the power to influence, and exercised the same to cause, CHC to engage in the conduct complained of herein, and were therefore control persons of CHC.

221. Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and having otherwise participated in the process which allowed the CHC IPO to be completed. Each of the Individual Defendants signed the Registration Statement, and thus had the power to, and did, influence and control the content of the statements contained therein.

222. As a result, the Individual Defendants are liable under Section 15 of the Securities Act.

223. This claim was brought within one year after discovery of the untrue statements and omissions in the Registration Statement, and within three years after CHC shares were sold to the Class in connection with CHC's IPO.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages as to Count II; and

E. Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: November 6, 2015

Respectfully Submitted,

KIRBY McINERNEY LLP

By: ____/s/ Ira M. Press______________

Ira M. Press
825 Third Avenue, 16th Floor
New York, NY 10022
Tel: (212) 371-6600
Fax: (212) 751-2540

*Counsel for Lead Plaintiff Rudman and Lead Counsel for Class*