UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ERROL RUDMAN, et al.,

                        Plaintiffs,

            -against-

CHC GROUP LTD., et al.,

                       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11-7-2016

15-cv-3773 (LAK)
and consolidated case

### MEMORANDUM OPINION

Appearances:

    Ira M. Press
    Meghan J. Summers
    KIRBY MCINERNEY LLP
    *Attorneys for Lead Plaintiffs Errol*
    *Rudman and Rudman Partners LP*
    *and Lead Counsel for the Class.*

    Andrew Lavender
    Neil A. Steiner
    Andrew Spievack
    Sarah Lyons
    DECHERT LLP
    *Attorneys for Defendants CHC Group*
    *Ltd., William J. Amelio, Joan S. Hooper,*
    *Rebecca Camden, William E. Macaulay,*
    *Jonathan Lewis and Kenneth W. Moore.*

    Charles S. Duggan
    Andrew Ditchfield
    Alyssa Beaver Gomez
    DAVIS POLK & WARDWELL LLP
    *Attorneys for Defendants J.P. Morgan*
    *Securities LLC, Barclays Capital Inc., UBS*

> *Securities LLC, HSBC Securities (USA) Inc.,*
> *RBC Capital Markets, LLC, Wells Fargo*
> *Securities, LLC, BNP Paribas Securities*
> *Corp., Standard Bank PLC, Cormark*
> *Securities (USA) Ltd., Cown and Company*
> *LLC, Raymond James & Associates, Inc.,*
> *Simmons & Company, International and*
> *Tudor, Pickering Holt & Co. Securities, Inc.*

LEWIS A. KAPLAN, *District Judge.*

Plaintiffs brought this putative securities class action against CHC Group Ltd. ("CHC"),

several of its officers and directors, and the underwriters of CHC's January 16, 2014 initial public

offering ("IPO"). They allege that the IPO registration statement (the "Registration Statement")[1]

omitted certain material facts, in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933

(the "Securities Act"). Defendants move to dismiss the consolidated amended complaint.

*Facts[2]*

CHC is one of the world's largest commercial helicopter operators and generates the

lion's share of its revenue from the provision of helicopter transportation services to customers in the

oil and gas industry.[3] Its contracts with those customers contain "two distinct fee streams" – variable

---

[1] For the sake of clarity, the Court refers to the final prospectus and registration collectively as the "Registration Statement," as the statements in the prospectus are "substantively identical" to those in the registration. DI 45 at 5 n.2. Page numbers refer to the final registration statement filed with the SEC.

[2] The Court draws these facts from the Amended Complaint and accepts them as true for the purposes of this motion. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678-79 (2009).

[3] DI 35 ¶ 3(a).

"flight charges" based on helicopter hours actually flown and fixed "standing charges" that customers pay to "reserv[e] specific CHC helicopter capacity" over the life of a contract.[4]  In exchange for these standing charges, payable regardless of actual hours flown, CHC promises to have helicopters and pilots "standing ready to provide flight services when needed."[5]  The standing charges are the more significant of the two fee streams, accounting for 70 percent of CHC's total revenue and "materially all" of its profits.[6]

During the relevant time period, CHC's fleet of heavy helicopters included 31 Eurocopter EC225s ("EC225s").[7]  "A series of incidents and malfunctions affecting EC225s" led to an "industry-wide suspension" of EC225 flights in October 2012, followed by a gradual phase-in of service during the second half of 2013.[8]  EC225 service resumed in the final market, Brazil, in December 2013.[9]  In response to the EC225 suspension, Petroleo Brasileiro S.A. ("Petrobras"), one of CHC's largest customers, "formally notified all of its EC225 providers" that it would cease making payments under its EC225 contracts, including all standing charges, while the aircraft were

---

[4]  DI 35 ¶ 3(c).

[5]  DI 35 ¶ 71.

[6]  DI 35 ¶ 3(d).

[7]  DI 35 ¶ 68.

[8]  DI 35 ¶ 78, 80.

[9]  DI 35 ¶ 78, 80, 83, 85.

inoperable.[10]  Petrobras' nonpayment "last[ed] through the EC225 return to service" and resulted in a dispute between it and CHC over the fees owed with respect to the suspension period.[11]

In the Registration Statement for its January16, 2014 IPO, CHC acknowledged the "temporary industry-wide suspension" of EC225s flights, stating that "[w]e have now resumed commercial service on the [EC225] fleet."[12]  CHC disclosed also that "[r]evenues in the Americas decreased by $25.5 million compared to the prior year period, primarily due to decreased revenue activity in Brazil of $20.3 million as a result of the EC225 suspension."[13]  Further, CHC explained in its summary of risk factors that it "rel[ied] on a limited number of large offshore helicopter support contracts with a limited number of customers" and that revenues would decline should any of those contracts be "terminated early or not renewed."[14]  It did not specifically disclose that Petrobras had declined to pay any fees on its EC225 contracts during the suspension period.

Two months after the IPO, in a March 12, 2014 press release on CHC's quarterly earnings, CHC represented that it expected revenue through the end of the fiscal year 2014 to be "flat to slightly down, reflecting the negative effect of the suspension and subsequent return to service of the

---

[10]     DI 35 ¶ 3(b), 90.

[11]     DI 35 ¶ 90, 92.

[12]     DI 46 Ex. B at 12.

[13]     DI 46 Ex. B at 62.

[14]     DI 46 Ex. B at 12.

EC225 aircraft."[15]  In a conference call on the topic, CHC's chief financial officer Joan Hooper affirmed that the "decline was partially driven by the impact of the EC225 return to service cost as we completed flight resumption of the remaining aircraft in Q3."[16]  CHC's stock price declined $1.19 per share, the largest single-day decline in the company's history, on the day the company announced its quarterly earnings.[17]

CHC's Form 10-Q quarterly report, filed on March 14, 2014, confirmed the lackluster results.  There, CHC disclosed that "[r]evenues in the Americas decreased by $26.9 million compared to the prior year period, primarily due to decreased revenue activity in Brazil of $21.3 million primarily as a result of the EC225 suspension."[18]  That $21.3 million loss in Brazil approximately matched the $20.3 million loss that CHC had attributed to the EC225 suspension in the Registration Statement three months earlier.

CHC ultimately disclosed the fee dispute with Petrobras during a conference call on July 10, 2014 in which it discussed CHC's earnings for the fourth quarter of fiscal year 2014.  CHC's president and chief executive officer Bill Amelio stated during the call that "CHC has the world's largest fleet of EC225s, so the suspension was a major disruption to our business and our customers."[19]  Chief financial officer Hooper elaborated that, while "most customers continued to pay their monthly

---

[15]

DI 46 Ex. C at 3.

[16]

DI 46 Ex. D at 5.

[17]

DI 35 ¶ 156.

[18]

DI 46 Ex. F at 72.

[19]

DI 46 Ex. H at 3.

standing charges, . . . starting in April of 2013, one of our customers, Petrobras, stopped making payments on contracts to CHC and other operators of 225s in Brazil until overwater flights with those aircraft resumed."[20]  CHC's stock declined $0.99 per share that day.[21]

Plaintiffs filed the first complaint in these consolidated actions in state court on April 17, 2015, alleging that CHC's failure to disclose the Petrobras fee dispute in its Registration Statement violated Sections 11, 12(a)(2), and 15 of the Securities Act.[22]  Specifically, plaintiffs contend that the omission rendered statements in the Registration Statement misleading and specifically contravened disclosure requirements found in Items 101, 303, and 503 of SEC Regulation S-K, Item 11A of SEC Form S-1, and SEC Regulation C.  In moving to dismiss, defendants argue that plaintiffs' claims are time-barred by the Securities Act's statute of limitations, that the alleged omissions are immaterial, and that, in any event, CHC adequately disclosed the impact of the EC225 suspension in the Registration Statement.

*Discussion*

I.  *Motion to Dismiss Standard*

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court "accept[s] as true all factual statements alleged in the complaint and draw[s] all reasonable inferences

---

[20]

*Id.* at 5.

[21]

DI 35 ¶ 157. CHC has since filed for relief under Chapter 11 of the Bankruptcy Code. DI 52. Consequently, this case is automatically stayed against CHC pursuant to Section 362(a). The case proceeds against the nondebtor individual and underwriter defendants. *See Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986).

[22]

DI 35 ¶ 197-223.

in favor of the non-moving party."[23]   That acceptance does not extend, however, to the legal conclusions in the complaint.[24]   The "complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"[25]   In addition to the allegations within the four corners of the complaint, in a securities case the Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[26]

While a statute of limitations defense in a securities case sometimes turns on disputed facts, the "facts on the face of the complaint and related documents" are sufficiently conclusive in "a vast number of cases" to permit resolution on a motion to dismiss.[27]   Similarly, although materiality is a mixed question of law and fact, a complaint properly may be dismissed for failure to state a claim if the alleged misstatements or omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."[28]

## II.   *Plaintiffs' Claims Are Untimely.*

Claims under Section 11, 12(a)(2), and 15 of the Securities Act must be "brought within

---

23

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

24

*Iqbal*, 556 U.S. at 678.

25

*Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

26

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

27

*LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 316 F.3d 148, 156 (2d Cir. 2003).

28

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (citations omitted).

one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence."[29]  Prior to the Supreme Court's decision in *Merck & Co. v. Reynolds*,[30] the test for whether a reasonably diligent plaintiff in a federal securities case should have discovered a misstatement or omission turned on the concept of "inquiry notice."[31] Circumstances that would "suggest to an investor of ordinary intelligence the probability that she has a cause of action," triggered a "duty to inquire."[32]  If the investor made no inquiry, courts imputed knowledge of the facts underlying a cause of action as of the date the duty arose.[33]  However, if the investor did so inquire, "the limitations period beg[an] to run from the date such inquiry should have revealed" the critical facts.[34]

The *Merck* Court rejected the inquiry notice standard as it applied to claims under Section 10(b) of the Securities Act of 1934.[35]  After *Merck*, circumstances can trigger a duty to inquire

---

29

15 U.S.C. § 77m.

30

559 U.S. 633 (2010).

31

*See, e.g., L.C. Capital*, 318 F.3d at 154; *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 349-50 (2d Cir. 1993).  *L.C. Capital* involved claims under Section 10(b) of the Securities Act of 1934, which are governed by a separate statute of limitations. Prior to *Merck*, however, inquiry notice applied equally to claims under Sections 11, 12(a)(2), and 15.  *See Dodds*, 12 F.3d at 349-50 (applying the test to claims under both federal securities acts).

32

*In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 245 (S.D.N.Y. 2007) (internal quotation marks omitted).

33

*L.C. Capital*, 318 F.3d at 154.

34

*Id.*

35

*See Merck*, 559 U.S. at 653 (holding that the "'discovery' of facts that put a plaintiff on 'inquiry notice' does not automatically begin the running of the limitations period").

about a potential cause of action, but "the limitations period commences not when a reasonable investor would have begun investigating, but when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation."[36]   The Second Circuit subsequently has held that, under *Merck*, "a fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in the complaint."[37] District courts in this circuit have split on whether *Merck* applies to the statute of limitations for claims under Sections 11, 12(a)(2), and 15, with an apparent majority having concluded that it does.[38]

Defendants contend that plaintiffs' claims are untimely under the applicable one year statute of limitations because plaintiffs were on inquiry notice as of the March 12, 2014, when CHC released its quarterly earnings confirming a $21.3 million decrease in revenue due to the EC225 suspension.   Defendants argue also that a reasonably diligent investor would have discovered the alleged omissions from publicly available sources as of that date.   Plaintiffs dispute whether the inquiry notice standard applies to their claims and maintain that the earliest possible date investors could have discovered the fact of the Petrobras nonpayment was the July 10, 2014 conference call during which CHC explicitly disclosed that fact for the first time.

The Court need not decide whether *Merck* applies to claims under Sections 11 and 12(a)(2) of the Securities Act, for the concept of inquiry notice would do no work in this case.   This is so because plaintiffs could and should have discovered the allegedly material omission – that Petrobras declined to make payments on its EC225 contracts with CHC for a time in 2013 – and

---

[36]

  *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011).

[37]

  *Id.* at 175.

[38]

  *See In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 763 (S.D.N.Y. 2012) (collecting cases and noting emerging consensus).

"adequately plead[ed] it in [a] complaint" over a year prior to the date they filed the first of these cases.[39] Indeed, this fact was largely obvious from disclosures in the Registration Statement itself.

Plaintiffs do not dispute that the Registration Statement itself described the EC225 suspension and identified Brazil as the market in which the company experienced an unexpected $20.3 million decrease in revenue as a result. They nevertheless protest that CHC did not identify two additional details – that Petrobras was one of the impacted Brazilian customers and that Petrobras's refusal to make payments on its EC225 contracts extended to the monthly standing charges. Plaintiffs' arguments are unpersuasive.

First, a reasonably diligent investor would have concluded that the $20.3 million decrease in revenue in Brazil involved Petrobras shortly after being alerted to the revenue decrease by the Registration Statement and March 12, 2014 disclosures. The Registration Statement emphasized Petrobras' prominence in Brazil, revealing that Petrobras was a global "top two" customer and one of only two "top ten"customers that CHC services in the country.[40] Petrobras, in turn, operates as a semi-public Brazilian energy company that produces over 90 percent of the country's oil and gas and maintains a relatively insignificant presence outside its home market.[41] The only other market in which CHC services Petrobras,"Africa Euro Asia," constitutes CHC's smallest area of operation by far in

---

[39]    *Pontiac*, 637 F.3d at 174.

[40]    DI 46 Ex. B at 8, 18. The Registration Statement identified BP as the other customer in the Brazilian market. *Id.* at 8. Together, CHC's "top ten customers accounted for approximately 60% of [the company's] total revenues." *Id.* at 23.

[41]    Petrobras, Annual Report (Form 20-F) (Apr. 30, 2014) at 24, 27 (stating that "Brazil provided 91% of our worldwide production in 2013" and that Petrobras was responsible for "an estimated 90.9% of Brail's total oil production").

terms of revenue.[42]  These figures make clear that the vast majority of CHC's business in Brazil went to Petrobras.  Thus, although CHC did not provide a customer-level breakdown of revenue lost due to the EC225 suspension, the Registration Statement provided more than enough information for an investor to conclude that a substantial loss in revenue on EC225 contracts in Brazil implicated Petrobras.  At the very least, the likelihood was sufficiently high that Plaintiffs could have alleged the fact in a complaint at the time of the IPO or shortly thereafter.  Plaintiffs' contrary position is untenable.[43]

Second, a diligent investor would have discovered that Petrobras disputed the amount owed on its EC225 contracts in 2013.  The Registration Statement announced an unusual decrease in *revenue*, which CHC generates through its four-to-five year contracts with oil and gas companies.  It thus intimated that established customers with EC225 contracts had paid less in 2013 even as the Brazilian market grew in importance.[44]  Plaintiffs variously characterize this fact as a "nonpayment" or "formal dispute."  Regardless of the label, however, plaintiffs' core contention is that CHC should have disclosed the fact that Petrobras *paid less* than the contract price during the suspension.  For all intents and purposes, the Registration Statement and March 12, 2014 disclosures did just that.

Plaintiffs' attempt to sidestep that obvious conclusion by faulting CHC for not detailing which of the two "fee-streams" was impacted.  They argue that "any reasonable investor would have assumed that such revenue declines resulted from the stoppage of variable flight charges during the

---

[42]

DI 46 Ex. B at 61.

[43]

According to plaintiffs, it was just as likely that the decline in revenue involved only CHC's contracts with BP.  Even if that were a *possibility*, the Court assumes the point of a view of a reasonable investor, who would not have made such an unlikely assumption.

[44]

DI 46 Ex. B at 62.

EC225 grounding, given that such charges were based on the number of hours actually flown."[45]

As an initial matter, plaintiffs' assertion clashes with the consolidated amended complaint's characterization of the standing fees as payable "in essence for reserving helicopter capacity" to assure that aircraft and pilots were "standing ready to provide flight services when needed."[46] Plaintiffs do not explain why anyone reasonably could have expected that a decline in revenue would have been limited to variable flight charges during a period in which CHC could not provide the services that justified *either* fee stream.

Even assuming that "any reasonable investor" would have believed as plaintiffs contend, information in publically available documents in plaintiffs' possession would have disabused them of that notion. SEC filings that plaintiffs incorporate into the consolidated amended complaint revealed that Petrobras refused to pay both variable flight and standing charges to CHC and its competitors. For example, CHC's primary competitor ERA disclosed in its 10-K on February 28, 2013 that Petrobras had "recently notified [ERA] *and the other helicopter operators in Brazil* of its intent to pay each operator only a percentage of the monthly rate going forward" and "that they may have the ability to terminate all EC225 helicopter contracts."[47] Plaintiffs rely on these and similar disclosures

---

[45]

DI 48 at 9.

[46]

DI 35 ¶ 71.

[47]

DI 35 ¶178 (emphasis added). In addition to the 10-K, plaintiffs incorporated into the consolidated amended complaint a litany of ERA's regulatory filings and public disclosures, including an August 13, 2013 conference call in which ERA's chief executive officer explained that Petrobras' policy of refusing to pay monthly standing charges applied "across the board" to the "other operators" in Brazil. *Id.* ¶ 186.

to plead materiality, but fail to grapple with their significance for the timeliness of their claims.[48]  That

failure is conclusive of this case because those disclosures establish that plaintiffs were on constructive

notice well before the one year limitations period of the same omissions they contend mislead investors.

In sum, the Court concludes that aspects of the alleged omission – that the EC225

suspension impacted CHC's contracts with Petrobras and that Petrobras did not pay the full amount

under those contracts in 2013 – were obvious based on the Registration Statement and March 12, 2014

disclosures.  Further, the Court holds that a reasonably diligent investor would have begun to inquire

into issues in Brazil as of March 12, 2014, if not at the moment of the IPO.  Such an investor would

have discovered through publically available information that Petrobras' nonpayment extended to

standing charges and probably could have so concluded from common sense alone.  Because a

reasonably diligent investor would have discovered the alleged omission over one year prior to the

filing of the initial complaint, plaintiffs' claims are untimely.  Nonetheless, the Court will address why

plaintiffs fail to state a claim on the merits under Sections 11, 12(a)(2), and 15 of the Securities Act as

an independent ground for granting Defendants' motion to dismiss.

III.     *The Consolidated Amended Complaint Fails to State a Claim Upon Which Relief Can Be Granted*

Sections 11, 12(a)(2), and 15 of the Securities Act impose liability on participants in

securities offerings when the public documents underlying the offerings contain material misstatements

---

[48]     Defendants have identified also a 2013 article in an online trade publication that describes Petrobras' decision to halt all payments on EC225 contracts during the suspension period. DI 35 Ex. J. Courts in this circuit have found a single news article sufficient to time-bar a securities claim. *See Shah v. Meeker*, 435 F.3d 244, 245 (2d Cir. 2006) (abrogated by *Merck*, 559 U.S. 633 (2010)).  This article is likely too obscure to have a similar effect as the article in *Shah*, and the Court does not rely on it as an independent ground for notice.  It does, however, tend to demonstrate that Petrobras' policy regarding its EC225 contracts was not a closely guarded secret in the industry.

or omissions.[49]  Section 11 applies to registration statements, Section 12(a)(2) applies to prospectuses

and oral communications, and Section 15, in turn, creates derivative liability for individuals or entities

that control any person liable under either of the other two sections.[50]  "Collectively," these provisions

"create[ ] three potential bases for liability based on registration statements and prospectuses filed with

the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure

obligation; and (3) an omission of information that is necessary to prevent existing disclosures from

being misleading."[51]  This case concerns the latter two bases.

A plaintiff must plead also the materiality of any alleged misstatement or omission.[52]

"[A] corporation is not required to disclose a fact merely because a reasonable investor would very

much like to know that fact."[53]  Rather, when a plaintiff pursues a claim on the basis of an alleged

omission, "the inquires as to duty and materiality coalesce," and the court asks whether "there is a

substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable

investor as having significantly altered the total mix of information available."[54]

Plaintiffs identify as the single omission the fact that Petrobras halted payment

(including standing charges) on its EC225 contracts during the suspension period.  They maintain that

---

[49]   *See* 15 U.S.C. § 77k(a), 77*l*(a)(2), 77o.

[50]   *See id.*

[51]   *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).

[52]   *See id.*

[53]   *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).

[54]   *Id.*

defendants were required to disclose that fact to prevent other statements from being misleading and to comply with affirmative disclosure obligations under various SEC regulations. Defendants dispute both points.

> A.    *Plaintiffs Fail to Identify Any Misleading Omission*

Plaintiffs assert that the following five statements in the Registration Statement were rendered materially misleading by the omission concerning Petrobras: that (1) Petrobras was CHC's single largest customer;[55] (2) CHC had a "strong customer relationship" with its top-ten customers, including Petrobras;[56] (3) CHC viewed as a risk factor the possibility that revenues could decline if any of its key contracts were terminated early;[57] (4) fixed monthly charges accounted for 71 to 75 percent of CHC's flying revenue;[58] and (5) the standing charges were a "key investment highlight" because they were "secure" and payable "irrespective of whether we fly."[59] The Court holds, however, that CHC's failure to disclose that Petrobras refused to pay fees on its EC225 contracts during the suspension period did not render any of those statements remotely misleading.

First, the omission did not make misleading the representation that Petrobras was one of CHC's largest customers in terms of revenue. The Registration Statement disclosed the actual dollar amount of revenue lost due to the EC225 suspension, and plaintiffs do not allege that this and other

---

[55]    DI 35 ¶ 125; DI 46 Ex. B at 8, 23, 111.

[56]    DI 35 ¶ 125; DI 46 Ex. B at 9, 112.

[57]    DI 35 ¶ 127; DI 46 Ex. B at 23.

[58]    DI 35 ¶ 73, 131-35, 161-63; DI 46 Ex. B at 1, 8, 52, 55, 103.

[59]    DI 35 ¶ 73, 75, 131-35, 161-63; DI 49-2 at 8, 19, 24.

figures were inaccurate.

Second, CHC's statements regarding its "strong" relationships with its customers was "no more than 'puffery' which does not give rise to securities violations."[60]  In any event, Petrobras' temporary nonpayment while helicopters under contract with CHC were inoperable would not have suggested that the long term strength of CHC's relationship with Petrobras was in question at the time of the Registration Statement.[61]

As to the statement on the risk factor, plaintiffs are correct that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."[62] Thus, a warning that revenues could decline if a major customer canceled or failed to renew its contract could be materially misleading if the company fails to disclose that such a customer had attempted cancel its contract prior to the offering.  But that is not what plaintiffs have alleged.  According to plaintiffs, Petrobras declined to make payments on its EC225 contracts for the period during the suspension in response to an unexpected event.  Because that was not the type of risk that CHC warned against, the alleged omission does not make the risk factor misleading.

The fourth and fifth statements concerned the nature of the standing charges.  In essence, plaintiffs argue that CHC's characterizations of the standing fees as steady sources of revenue were misleading because at least one major customer had refused to pay them in the past. But plaintiffs in this instance again run headlong into their own characterizations of standing fees payable "in essence

---

60

   *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).

61

   Plaintiffs concede that Petrobras "resumed payment" on the contracts in question at the end of the EC225 suspension period in December 2013.  DI 48 at 14 n.14.

62

   *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

for reserving helicopter capacity."[63]  Petrobras presumably refused to pay the standing charges during

the EC225 suspension because CHC was not providing the service that justified those charges – the

reservation of EC225 capacity.  The facts alleged in the consolidated amended complaint, read in the

light most favorable to plaintiffs, do not support plaintiffs' assertion in its motion papers that Petrobras'

nonpayment undermined CHC's general ability to collect standing fees on its contracts.[64]  Without any

allegation that the dispute with Petrobras extended beyond the unique circumstances of the EC225

suspension, the Court cannot conclude that the alleged omission rendered the Registration Statement's

general description of standing charges misleading.

   At bottom, plaintiffs' argument is that a temporary fee dispute with a significant

customer is the type of information that an investor would like to know.  But companies must choose

to what granular level they will disclose an unusual event.[65]  Here, CHC disclosed the precise dollar

amount it lost in Brazil due to the EC225 suspension, but did not state which customer or "fee stream"

was affected.[66]  CHC had no duty to provide a level of detail satisfactory to plaintiffs, only to make sure

---

[63]   DI 35 ¶ 71.

[64]

  *See* DI 48 at 14 (arguing that the Petrobras nonpayment "implicated the legality and
enforceability of CHC's allegedly secure standing charges").

[65]

  Different companies properly may choose differing levels of specificity.  Plaintiffs are
wrong to assert that because one of CHC's competitors named Petrobras and its refusal to
pay standing charges that it was a material omission for CHC not to provide similar details
in its EC225 disclosure.

[66]

  The $21.3 million drop amounted to 1.6% of CHC's total revenue for the nine month period
in question and 1.2% of its total revenue for fiscal year 2014.  DI 46 Ex. G.  That amount
is well below the 5% materiality threshold established by the SEC.  *See* SEC Staff
Accounting Bulletin No. 99, 64 Fed. Reg. 45150, 45151 (1999).

that once it spoke on a matter, it did so fairly and accurately.[67] Plaintiffs fail to identify any way in which the Registration Statement was misleading without that added detail. That failure compels this Court's conclusion that reasonable minds would concur that there is no "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available."[68]

Accordingly, the Court grants defendants' motion to dismiss for the alternative and additional reason that the consolidated amended complaint fails to state a claim upon which relief can be granted under Sections 11, 12(a)(2), and 15 of the Securities Act.[69]

### B. SEC Regulations Did Not Require Disclosure

Plaintiffs contend that several SEC regulations imposed on CHC an affirmative duty to disclose the fact that Petrobras failed to pay its standing fees during the EC225 suspension. Plaintiffs' arguments are largely redundant of those addressed above and thus unpersuasive. The Court rejects them.

#### (i) Items 101, 303, and 503 of Regulation S-K

Item 101 requires a registrant to disclose its dependence "upon a single customer, or

---

[67]

> See Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002); see also Resnik v. Swartz, 303 F.3d 147, 154 (2d Cir. 2002) ("Disclosure of an item of information is not required, however, simply because it may be relevant or of interest to a reasonable investor.").

[68]

> In re Time Warner, 9 F.3d at 267.

[69]

> Because liability under Section 15 is derivative of liability under the other two sections, the Court dismisses the Section 15 claims for the same reasons stated above. Further, the parties agree that all claims against defendant Moore should be dismissed because he did not sign the Registration Statement. DI 48 at 34.

a few customers, the loss of any one or more of which would have a material adverse effect."[70]  The Registration Statement listed CHC's top ten customers, including Petrobras, and the markets in which they operated.[71]  It further warned that CHC relies on "a limited number of large offshore helicopter support contracts with a limited number of customers," and warned of the consequences of this fact.[72]  Accordingly, plaintiffs' argument is without merit.

Item 303 compels disclosure of, *inter alia*, "unusual or infrequent events . . . that materially affected the amount of reported income from continuing operations" and "known trends and uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues."[73]  The Registration Statement disclosed the fact of the EC225 grounding and its impact on revenues, even breaking down the impact across different markets.[74]  It thus disclosed that unusual event and its effect on reported income.  Moreover, by the time CHC filed the Registration Statement the last of the EC225 had returned to operation.[75]  Consequently, Petrobras' temporary nonpayment was not a "known trend" or uncertainty that Item 303 would have required CHC to disclose.  This argument too fails.

Item 503 provides that offering documents must describe "under the caption 'Risk

---

[70]     17 C.F.R § 229.101(c)(1)(vii).

[71]     DI 46 Ex. B at 8.

[72]     DI 46 Ex. B at 12.

[73]     17 C.F.R. § 229.303(a)(3)(i)-(ii).

[74]     DI 46 Ex. B at 61-62.

[75]     DI 46 Ex. B at 12.

Factors' a discussion of the most significant factors that make the offering speculative or risky."[76] "[C]ourts typically analyze the sufficiency of Item 503 disclosures with the familiar materiality standard."[77]   As the Court explained above, plaintiffs have failed to identify a singe portion of the Registration Statement that the alleged omission rendered misleading.  This failure applies to their critique of the Risk Factors, none of which are undermined or called into doubt by the omitted details of the Petrobras nonpayment.

### (ii) Item 11A on Form S-1

This item requires registrants that wish to rely on prior periodic SEC reports for the purposes of a registration statement to "describe any and all material changes in the registrant's affairs" since the end of the fiscal year encompassed by the prior filings.  This provision does not assist plaintiffs because CHC did disclose the financial impact of the EC225 suspension in its Registration Statement.  The question of whether the omitted details were "material" is, again, duplicative of arguments that the Court rejected above.

### (iii) Regulation C

Finally, Regulation C requires registrants to "add[ ] such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading."[78]   This provision imposes the same duty as the Securities Act

---

[76]   17 C.F.R. § 229.503(c).

[77]   *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011).

[78]   17 C.F.R. § 230.408(a).

to disclose information necessary make other disclosures not misleading.[79]   Plaintiffs arguments thus fail for the reasons stated above.

### Conclusion

For all of the foregoing reasons, defendants' joint motion to dismiss the consolidated amended complaint in these consolidated cases [DI #44 in 15-cv-3733 and DI #28 in 15-cv-3796] is granted to the extent that the action is dismissed as against all defendants except CHC and denied as to CHC only on the ground that the continuation of this action as against it is precluded by 11 U.S.C. § 362(a).

In view of the fact that this ruling finally disposes of all claims against all defendants save CHC (and, as a practical matter, in its entirety), there is no just reason for delay.  The Clerk shall enter final judgment dismissing the action as to all defendants other than CHC.  She shall transfer the case, insofar as it is brought against CHC to the suspense docket and close the case for administrative purposes.

SO ORDERED.

Dated:          November 7, 2016

Lewis A. Kaplan
United States District Judge

---

[79]   *See In re Morgan Stanley*, 592 F.3d at 365.