UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ERROL RUDMAN, et al.,

                        Plaintiffs,

              -against-

CHC GROUP LTD., et al.,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/24/18

15-cv-3773 (LAK)
and consolidated case

## MEMORANDUM OPINION
(Corrected)

Appearances:

> Ira M. Press
> Meghan Joan Summers
> KIRBY MCINERNEY LLP
> *Attorneys for Lead Plaintiff Errol*
> *Rudman and Rudman Partners LP*
> *and Lead Counsel for the Class*

LEWIS A. KAPLAN, *District Judge.*

        This securities class action was dismissed on motion and then settled almost immediately after plaintiffs filed a notice of appeal. The matter is before the Court on a motion by plaintiffs' counsel for an award of attorneys' fees. As in virtually all such cases, any fee award is to come out of the settlement fund and thus entirely out of the proceeds otherwise payable to the class members. The defendants therefore are indifferent to this motion. It is the Court's task, unaided by the usual adversary process, to ensure that the fee award is fair and reasonable from the perspective

of the absent class members and provides counsel with just, not more than just, compensation for their efforts.

*Facts*

Plaintiffs brought these damages actions under the Securities Act of 1933 claiming that the registration statement issued in connection with the initial public offering of shares of CHC Group Ltd. ("CHC") contained false and misleading statements. Two motions for designation as lead plaintiff and for approval of lead counsel were filed. One sought designation of Ira B. Press, Esq., of Kirby & McInerney as lead counsel (the "Kirby Motion"). The other sought such a designation of Kim E. Miller, Esq., of the firm of Kahn Swick & Foti, LLC (the "Kahn Motion"). Kahn Swift promptly conceded the merit of the Kirby motion. In due course, the Court granted the Kirby motion, denied the Kahn Motion, consolidated the two cases, and granted leave to file a consolidated amended complaint. From that point until following the settlement of the consolidated cases, the Kahn firm neither appeared in these actions, nor signed any of the court papers.

Following the Kirby firm's filing of the amended complaint, defendants moved to dismiss as to all defendants save CHC, which by then had filed for bankruptcy. On November 7, 2016, the Court granted the motion and dismissed the case.[1] As the opinion reflects, it considered this to be a very weak claim.

Plaintiffs appealed. But virtually nothing transpired in the Court of Appeals. Less than a month after the filing of the notice of appeal, the parties notified the Court of Appeals that they had reached a settlement in principle and withdrew the appeal from active consideration pending

---

[1] DI 54; *Rudman v. CHC Grp. Ltd.*, 217 F. Supp. 3d 718 (S.D.N.Y. 2016).

finalization of settlement papers and an application to this Court to approve the settlement.[2]

The terms of the settlement are straightforward. CHC's insurance carrier is paying $3.85 million in cash.[3] In order to appreciate the benefit to the class, it is relevant to point out that this $3.85 million reflects just over one percent of the amount of money CHC raised on the allegedly misleading prospectus, which covered an offering of 34 million shares at a price of $10 per share, or $340,000,000. As the class notice made clear, the average recovery by damaged class members would be about 11 cents per share,[4] assuming that plaintiffs' counsel was paid as they request.[5]

Plaintiffs moved for class certification and for approval of the settlement.[6] As plaintiffs already had lost the case by the time the settlement was reached and as the Court regarded the prospects for ultimate success to be virtually negligible, it approved the settlement.[7] It did so

---

[2]

*Rudman v. Amelio,* No. 16-4096, DI 39 (2d Cir. filed Jan. 4, 2017).

[3]

Stipulation of Settlement (DI 60-1) §§ 2.1, 7.1(b).

[4]

DI 60-1, Ex. A-1, at 3.

[5]

The Court recognizes that recovery of the entire $340 million raised in the IPO apparently never would have been in the cards even if the suit had been meritorious. The more relevant question is the size of the $3.85 million settlement as a proportion of an appropriate assessment of damages if the plaintiffs had prevailed. Plaintiffs have provided virtually no information on that subject. They have confined themselves to the unsworn contention in a legal memorandum that the $3.85 million settlement is equal to 9.78 percent of total estimated class-wide losses. Pl. Mem. [DI 71] at 1. That contention, which is unsupported by an evidence, implies that the total estimated class wide damages were in the neighborhood of $40,000,000. In any case, were plaintiffs' counsel awarded one third of the settlement, and were this unsubstantiated total loss estimate accurate, the class members would receive something like 6.2 percent of their estimated losses.

[6]

DI 58.

[7]

DI 76.

essentially on the theory that 11 cents per share was better than nothing.

The Kirby firm, suddenly joined by the Kahn firm, now seek attorneys fees equal to one third of the settlement fund, or $1,283,333.33 – approximately 33.33 percent of the settlement fund. Their combined lodestar allegedly is $725,913.25, which is said to reflect 1,259.16 hours of work multiplied by the current billing rates of the attorneys and other staff who worked on the case.[8] This is increased by a multiplier of approximately 1.77. In addition, counsel seek reimbursement of $12,723.86 in litigation expenses.[9]

There have been no objections to counsel's proposed fees and expenses. This is far from surprising. As 100 percent of any fee award will come out of the $3.85 million that the insurance company has provided, neither it nor the defendants have any interest in objecting to the requested fee award. Nor does it appear likely that any member of the class would have sufficient economic interest, given the meager size of the settlement, to challenge the fee award even if it thought a marginal adjustment to the fees requested were likely; the incremental difference to any given class member probably would be too small.[10]

---

[8]    DI 77. The Court requested that counsel provide the Court with counsel's billing rates that were effective at the time work was performed, and counsel did so. *Id.*

[9]    DI 71.

[10]    If, as plaintiffs have said, the average recovery (assuming that one third of the $3.85 million were to go to counsel) is expected to be 11 cents per share, even an outright denial of any fees, an unrealistic and unwarranted outcome, would increase the recovery per share by only fifty percent, or about 5.5 cents per share.

*Discussion*

I.      *Legal Standard*

Rule 23(h) allows the Court to "award reasonable attorney's fees and nontaxable costs" in a certified class action.[11]  What is "reasonable" is left to the discretion of the Court, which is "intimately familiar with the nuances of the case."[12]  In exercising that discretion, he Court acts as a fiduciary for the class, which it must protect from excessive awards.[13] A fee applicant, moreover, bears the burden of establishing the reasonableness of the requested award, including the number of hours for which the applicant seeks compensation.[14]

The Court may evaluate the reasonableness of a fee request using either the percentage of the fund or the lodestar method.[15]  The latter requires the Court to compute a reasonable lodestar amount. To do this, the Court first ascertains "the number of hours reasonably billed to the class," and then multiplies that figure by "an appropriate hourly rate."[16]  Then that figure may be increased, in some circumstances, by applying an appropriate multiplier.  If the Court instead uses the percentage of the fund method, it determines a percentage of the recovery that would constitute an

---

[11]     FED. R. CIV. P. 23(h).

[12]     *In re Bolar Pharm. Co. Sec. Litig.*, 966 F.2d 731, 732 (2d Cir. 1992) (*per curiam*).

[13]     *City of Detroit v. Grinell Corp.*, 560 F.2d 1093, 1099 (2d Cir. 1977), *abrogated on other grounds by Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43 (2d Cir. 2000).

[14]     *Cruz v. Local Union No. 3 of Int'l Bhd. Of Elc. Workers*, 34 F.3d 1148, 1160 (2d Cir. 1994).

[15]     *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005).

[16]     *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).

appropriate fee. The methods are not mutually exclusive, however. Many courts in this circuit "cross-check" a percentage of the fund with the lodestar to "ensure that the percentage of the fund method yields appropriate compensation without resulting in a windfall for plaintiffs' attorneys."[17] Whichever method the Court uses, it is guided by the six case-specific factors that the Second Circuit described in *Goldberger v. Integrated Resources* ("the *Goldberger* factors"): (1) counsel's time and labor, (2) the litigation's magnitude and complexity, (3) the risk of the litigation, (4) the quality of representation, (5) the requested fee in relation to the settlement, and (6) public policy considerations.[18]

Although the steps are clear, a reviewing court faces difficulties when evaluating a requested fee award in this context. As this Court has noted before, "[f]ocusing on the lodestar encourages investment of needless hours, while the percentage of the fund method can generate egregiously high fees for the lawyers and encourage counsel to settle a case prematurely."[19] The Court's discretion is guided significantly by its experience.

II.      *The Kirby Firm's Lodestar Reflects an Unreasonably High Number of Hours*

The Kirby firm achieved a benefit for the class – it obtained a small settlement in an extremely weak case. Under the common benefit theory, it is entitled to reasonable compensation for having done so. The Court begins its analysis with the Kirby firm's claimed lodestar.

---

[17]

> *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 373 (S.D.N.Y. 2013).

[18]

> *Goldberger*, 209 F.3d at 50.

[19]

> *In re IndyMac Mortg.-Backed Sec. Litig.*, 94 F. Supp. 3d 517, 521-22 (S.D.N.Y. 2015), *aff'd sub nom. DeValerio v. Olinski*, 673 F. App'x 87 (2d Cir. 2016).

The Kirby firm's claimed lodestar seeks compensation for 1138.76 hours, of which 769.01 are attributable to lawyers and paralegals. The hourly rates claimed for these individuals range from $210 to $985 per hour. The Court finds those hourly rates reasonable in all the circumstances. But it has substantial concerns with respect to the hours expended by those lawyers and paralegals.

A.    *Lawyers and Paralegals*

In response to the Court's request for more data on the basis for the lodestar claim, the Kirby firm submitted a categorization of its hours by task or groups of tasks. The first category of concern is time spent on the lead plaintiff motion. The Kirby firm reports that its lawyers and paralegals spent nearly 100 hours[20] on its lead plaintiff motion. Unfortunately, counsel's only description of its efforts is "[r]esearching, drafting and briefing of lead plaintiff motions."[21]

Initial motions to appoint a lead plaintiff and to approve its choice of lead counsel in cases which, like this one, is subject to the Private Securities Litigation Reform Act ("PSLRA"), are routine.[22] That was true here, as there was no controversy because the only other movant conceded the merit of the Rudman–Kirby firm motion. As the Rudman firm emphasizes, it is experienced in this sort of litigation. The motion in this case could have been little more than a modest revision of

---

[20]

These hours and all hours hereafter discussed do not include hours attributed to Kirby's senior analysts and administrative clerks or Kahn, Swift & Foti.

[21]

DI 77, at p. 5.

[22]

If such a motion is seriously contested, it may be litigated vigorously and require significant effort.

an often used form, and certainly there is no contention to the contrary. The Court cannot justify

compensating it for about 100 hours of work spent on an essentially boilerplate motion.

Another category lumped together time spent on the motion to dismiss the amended

complaint and time spent on "case management" without breaking those activities down and without

providing contemporaneous time records. The firm says it spent almost 210 hours on these tasks.

The perfunctory justification for those hours is that the firm spent considerable time

researching "the impact of CHC's bankruptcy on the Action" in addition to responding to the motion

to dismiss.[23] But counsel have given no details on what that research involved and why it warranted

so much time. Nor is there any explanation of how much time was spent on "case management" or

what that entailed. This presents a difficulty.

The Court acknowledges that responding to the motion to dismiss was a critically

important task that deserved care and effort. But it has no basis for concluding how much time was

spent on that motion or, for that matter, on bankruptcy research and "case management," let alone

why that time was justified.[24] Plaintiffs' counsel therefore have failed to persuade the Court that "an

efficient attorney would have engaged in similar time expenditures" – especially considering the

---

[23]

        *Id.* The Court assumes this task comes within the nebulous term "case management."

[24]

        Any lawyer with any experience at all would have known that the filing of the CHC bankruptcy stayed proceedings against that defendant but not against others. The Court has no idea what else concerning the bankruptcy there was to figure out.

        "Case management" is equally a black hole. The Court of course understands that cases with multiple parties, significant discovery, and other complexities require discussions with adversaries, scheduling issues, and all sorts of other things that could fall under "case management." But this was a simple case. It involved filing and amending a complaint, litigating a single motion to dismiss, and no discovery. There is no evidence of any case management.

failure to justify time spent conducting bankruptcy research and the failure to offer any description of whatever else "case management" might entail.[25]  The motion to dismiss justifies a significant amount of time, to be sure.  But not 210 hours.

The 31 hours attributed to the appeal are even more difficult to justify.  Plaintiffs filed the notice of appeal on December 7, 2016.[26]  They agreed to dismiss the appeal not much more than one month later.[27]  They filed no brief.  And plaintiffs' counsel has offered no explanation as to why 31 hours were spent on a notice of appeal, a notice of appearance, and a stipulation to withdraw the case.

Finally, the preliminary motion for settlement and class certification, final settlement approval, and post-settlement stages account for 137.51 hours of work.  Each of these motions was unopposed.  Each of these tasks was something plaintiffs' counsel, as experienced securities class action litigators, surely have performed many times over.  And again, plaintiffs' counsel offered to the Court only a bare-bones description of the task and scant justification for this large request.  It is hard to believe that all of these hours were spent "usefully and reasonably."[28]

B.      *Analysts and Administrative Clerks*

In addition to the time invested by lawyers and paralegals, the Kirby firm includes in

---

[25]

*In re IndyMac*, 94 F. Supp. 3d at 527.

[26]

DI 56.

[27]

DI 57.

[28]

*See Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994).

its proposed lodestar 369.75 hours attributed to "senior analysts" (360.75 hours) and "administrative clerks" (9 hours). It has given no explanation at all as to what these categories of employees are, their qualifications, or – beyond placing their claimed hours into the activity categories in the application – what they did. There is no information about how they are paid or on whether other firms charge on an hourly basis for comparable personnel. There is no data on comparable market rates, if indeed there are any.

It now is well established that attorneys' fee awards should reflect reasonable compensation for the work product of attorneys. In appropriate cases, such awards may include compensation for the work of paralegals and other non-lawyers.[29] The more difficult question is how the work of non-lawyers is to be valued in determining the overall attorneys' fee.[30] As the Supreme Court has said with respect to paralegals, albeit in a Section 1988 case, "the prevailing practice in a given community"[31] is to govern whether paralegals' time is billed separately, and whether it is billed at cost or at market rates.[32]

At this point, it is well known that paralegals, at least in this market, customarily are billed by law firms for their time at hourly rates. That is reflected in the Court's ruling here with respect to the Kirby firm's paralegals. But the practices of the Bar concerning "senior analysts" and "administrative clerks," assuming there are any general practices, is unknown to the Court and

---

[29]

     *E.g., U.S. Football League v. Nat'l Football League,* 887 F.2d 408, 415-16 (2d Cir. 1989).

[30]

     *Id.* at 416.

[31]

     *Missouri v. Jenkins by Agyei,* 491 U.S. 274, 287 (1989).

[32]

     *U.S. Football League,* 887 F.2d at 416.

certainly not established by the Kirby firm's papers. Accordingly, the Court declines to include the hours and rates advanced by the Kirby firm.

This of course is not to say that the Court ignores whatever contribution such personnel made to the Kirby firm's work product in fixing a reasonable fee. Their work, like that of others "whose labor contributes to the work product," is likely "included in calculation of the lawyers' hourly rates," as ordinarily is true of other overhead costs like rent, firm administrative staff, and the like.[33] And as will be seen, the multiplier that the Court ultimately applies to the Kirby firm's adjusted lodestar takes into account that contribution, as does its consideration of the percentage of the recovery that seems appropriate in all of the circumstances. The point, however, is that the Court does not consider it appropriate on this meager record to include the hours of those personnel in the Kirby firm's lodestar or to make any determination with respect to the reasonableness of the hourly rates used by that firm for them.

C.     *Summary*

In view of the foregoing considerations, the Court makes the following adjustments to the Kirby firm's proposed lodestar for its own work. It excludes the hours of the senior analysts and the administrative clerks. It exercises its discretion to cut the hours claimed for the following categories of work by 50 percent: the lead plaintiff motion, the motion to dismiss and case management, the appeal, the preliminary motion for settlement approval and class certification, the motion for final settlement approval, and post-settlement. This results in a revised aggregate lodestar

---

[33]
> *See W. Virginia Univ. Hosps. v. Casey*, 499 U.S. 83, 99 (1991), *superseded by statute*, *Landgraf v. USI Film Prods., et al.*, 511 U.S. 244 (1994).

for the Kirby firm of $293,023.88.[34]

Taking into account the benefit to the class attributable to the Kirby firm's efforts, the contribution of the senior analysts and the administrative clerks to the overall work product of the firm, and the delay in payment, the Court applies a multiplier of 2.0.[35]  Accordingly, the adjusted lodestar for the Kirby firm is  $586,047.76.

III.    *Plaintiffs Have Not Established Any Basis for a Fee Award to the Kahn Firm*

The Kahn firm, which was not chosen as lead counsel, seeks compensation for 120.4 hours of work, including 33.90 hours for its lead plaintiff motion.

The Court sees no basis at all for compensating the Kahn firm for the time devoted to its unsuccessful motion to have its client appointed lead plaintiff and itself appointed as lead counsel.  Although the motion was entirely appropriate under the PSLRA, it was filed for the benefit of the Kahn firm, it was unsuccessful and it accomplished nothing at all for the members of the alleged class.  That time contributed nothing to the $3.85 million common fund that eventually was created in this case.

Nor is there any basis for supposing that any other time devoted to the case by the

---

[34]
558.11 hours multiplied by the average hourly rate of Kirby's original request.  The Court calculated the average rate of Kirby's original request using the billing rates effective at the time the work was performed.

[35]
This multiplier is higher than the Court would have applied had the work of the senior analysts and administrative clerks been included on an hourly basis in the Kirby firm's lodestar.

It is higher also than the multiplier the Court would have applied had the lodestar been calculated using the current hourly rates of the Kirby firm, as was requested, rather than the then-effective rates.

Kahn firm contributed to the benefit secured by the settlement. Once the Kirby firm filed its lead counsel motion, the Kahn firm conceded that the Kirby firm and its clients had won the prize of leadership of the case. So far as the docket sheet and filed papers disclose, the Kahn firm did nothing else from that point onward. It did not appear in court. It signed no papers. Its name does not appear in the settlement stipulation. Indeed, the class notice submitted by the Kirby firm and approved by the Court not only does not even mention the Kahn firm – it states that "Lead Plaintiffs and the Settlement Class are being represented by Kirby McInerney PLC," thus implying that it was represented only by the Kirby firm. The Kahn firm has done nothing more than submit a schedule listing claimed aggregate hours and purported billing rates along with a conclusory two-sentence description of services said to have been performed.[36]

The Court declines in these circumstances to make any fee award to the Kahn firm.

IV.     *The Requested Fee Award Would Be An Unreasonably High Percentage of the Fund*

Next, the Court considers the fee request as a percentage of the fund.

Plaintiffs' counsel argues that the proposed fee, which would be one third of the settlement fund, is "fair and reasonable."[37] They cite numerous cases in which courts – both in this

---

[36]

DI 72-3 & Ex. 1.

It has submitted no contemporaneous time records in support of its fee application. While that is true also of the Kirby firm, it is abundantly clear to the Court from its familiarity with the litigation firm and with its submission of multiple court papers bearing its imprint that the Kirby firm in fact litigated the case on behalf of the plaintiff class. No such conclusion is supportable as to the Kahn firm.

[37]

DI 71, p. 6.

Circuit and elsewhere – have approved a similar percentage of similarly-sized funds.[38] They cite also a NERA report indicating that the median fee award in securities class actions was 30 percent of the fund when the fund was less than $5 million.[39]

This data is a helpful starting point, but stops far short of painting a full picture of the requested fee's reasonableness. Although plaintiffs' counsel cites many cases in which courts have awarded similar percentages, no string cite alone – especially not the one here, which cherry picks awards that favor plaintiffs' position but ignores others – could adequately justify a fee award: there are simply too many cases to choose from. Between 500 and 700 securities class actions were pending in the federal courts in any given year from 2012 to 2016.[40] Given the volume of these cases, even a list of 50 examples could present a distorted picture of what is "reasonable."

The report indicating a median fee award of 30 percent is slightly more helpful. But, as this Court has observed before, the NERA report shows higher fee awards than other reports have found.[41] For example, a different study found that from 1993-2003 the median fee was 25 percent in cases with settlements between $2.8 and $5 million.[42] And fee awards reportedly have been

---

[38]

    *Id.* at pp. 6-8.

[39]

    *Id.* at 8.

[40]

    DI 72, Exh. F, at p. 26. 47 to 57 percent of those cases had a settlement of $10 million or less. *Id.* at 32.

[41]

    *In re IndyMac*, 94 F. Supp. 3d at 523-24.

[42]

    Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements 1993-2008*, 7 J. EMPIRICAL LEGAL STUDIES 248, 265 (table 7) (2010).

trending downward since then.[43]

Therefore, the Court finds that a fee award of one third of the fund – a percentage higher even than the median number given by the plaintiff – would be an unreasonably high percentage of the fund, particularly given the almost trivial per share recovery. The Court's proposed award based on a its revision of the lodestar is approximately 15.2 percent of the fund. Although that percentage is lower than the median award regardless of which study is cited, it is not so much lower than the (likely less than) 25 percent median at least one study has found. And for reasons the Court now discusses, a below-median fee is reasonable in this case.

*V.*     *The* Goldberger *Factors*

Finally, careful consideration of the *Goldberger* factors confirms that counsel's fee request is unreasonably high.[44]

**(1) Counsel's time and labor.** Plaintiffs' counsel claim to have devoted 1,259.16 hours to this litigation.[45] That is a considerable amount of labor. But, as discussed above, the Court finds that not all of those hours were spent reasonably.

**(2) The magnitude and complexity of the action.** Counsel asserts that this case was at least as complex as the average securities fraud class action – an area of law that has been

---

[43]

DI 72, Exh. F, at p. 39 ("We also observe that fee percentages have been decreasing over time, except for fees awarded on very large settlements.").

[44]

*Wal-Mart*, 396 F.3d at 121.

[45]

DI 77, p. 3.

described as "notorious[ly] complex[]."[46]  With respect, the Court disagrees.  This one, in its view, was simple and straightforward.

(3) **The litigation risks involved.**  There is no doubt that the litigation risk in this case for the plaintiffs and their counsel was extremely high.  This is reflected in its dismissal on motion and in the fact that the settlement agreed to by the insurance carrier amounted to about one percent of the size of the initial public offering that plaintiffs attacked.  But while high litigation risk in a case that nevertheless results in a recovery for a plaintiff claims often argues in favor of a more rather than less substantial fee, that is not always true.  While the bringing of this case perhaps did not run afoul of Rule 11, the ready dismissal on motion and the small size of the settlement suggest that there was not much to it.  Indeed, while $3.85 million is a lot of money in most circumstances, it is not a substantial settlement in the securities class action world – more than a nuisance payment but not substantially so.

(4) **The quality of class counsel's representation.**  The Court finds that class counsel represented the class effectively.  Plaintiffs' counsel are experienced in securities litigation and managed here to obtain a settlement for the class.  As noted, they are entitled to credit for that.

(5) **The requested fee in relation to the settlement.**  Counsel asserts that the fee is appropriate in relation to the settlement and approximates what counsel would receive if they were bargaining in the open market.  But as discussed above, the Court finds the requested fee to be an unreasonable percentage of the fund.  Moreover, the requested fee would be 8.38 times the reasonable value of the Kirby firm's lodestar before the application of the multiplier and mor ethan double the lodestar adjusted upward by the 2.0 multiplier.

---

[46] DI 71, at 11.

**(6) Public policy considerations**.  Counsel point to the importance of private enforcement of securities law and the need to attract well-qualified attorneys to litigate such cases. The Court is in full agreement with plaintiffs' counsel on those points.

But a *reasonable* fee is the proper incentive, and it is within the Court's discretion to determine what is reasonable.  The largely *pro forma* nature of this case indicates that a reasonable fee is less than what plaintiffs' counsel requests.  The Court finds that a fee award of $586,047.76 would better balance the interests of the class and adequate compensation of counsel.

VI.     *The Request for Reimbursement of Expenses*

Plaintiffs' counsel seeks $12,723.86 in reimbursement of expenses.  The majority of the expenses are attributable to mediation and online legal research fees.  Others include filing fees and travel expenses.  The Court finds nothing objectionable.  That is granted.

*Conclusion*

Plaintiffs' motion for attorneys' fees and reimbursement of expenses [DI 70] is granted to the extent that the Kirby firm is hereby awarded an aggregate amount of $598,771.62.  It is denied in all other respects.

SO ORDERED.

Dated:        July 23, 2018
Corrected:   July 24, 2018

Lewis A. Kaplan
United States District Judge